[Crim. No. 4377. First Dist., Div. One. Apr. 21, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JOE L. BEVERLY, Defendant and Appellant.

706

Joe L. Beverly, in pro. per., and John Alden Doty, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—On this appeal from a judgment after conviction by a jury of murder in the second degree (Pen. Code, § 187), several questions are raised by defendant. We shall discuss the facts pertinent to each question in our separate consideration of the points raised on this appeal. Preliminarily, however, we set out the following basic facts:

The evidence supportive of the jury's verdict is as follows: On the evening of November 15, 1962, defendant, upon re-

turning to his apartment, found his wife, Anne, her girl friend, Betty Green, and a neighbor, Gordon Tolliver, in the living room. Shortly thereafter they were joined by Gene Knox, James Wilson and Kenneth Boyd. Anne had brought these guests together for a card game. Defendant requested several times that Anne come into the bedroom. Upon her refusal an argument ensued between Anne and defendant, whereupon the latter picked up a coke bottle and slammed it against her face. Boyd remonstrated that defendant should not hit his wife Defendant replied that Anne was his wife and that he could do anything he wanted to. Defendant left the apartment but returned several minutes later. He then slipped off his jacket, produced a knife and moved towards his wife who darted behind Boyd. Angry words were exchanged. Anne refused to move from behind Boyd until defendant ceased threatening her with the knife. Defendant then folded the knife and placed it in a pocket of his trousers. While this altercation was in progress Wilson had gravitated toward the outside door and was urging Boyd to leave and not to become involved in a family quarrel. As Boyd turned around to walk out the door, defendant opened the knife, ran behind Boyd and twice rammed the knife in his back. Boyd subsequently died at a hospital from an internal hemorrhage due to the infliction of the two stab wounds in his back. After the stabbing defendant reappeared in the apartment clutching the knife. Only Anne and her girl friend were then present. Defendant told them he had stabbed Boyd because he did not appreciate Boyd's telling him what to do. Several hours later defendant notified the police that he had stabbed a man earlier that evening, and he was thereupon placed under arrest. A police officer searched defendant's jacket and discovered a knife in the lining. Defendant admitted that it was the knife used in the stabbing. He again admitted stabbing Boyd at the police station and when he was subsequently interrogated by Police Inspector Asdrubale.

Defendant took the stand in his own defense and testified substantially as follows: On the night in question he had asked Boyd, Knox and Wilson to leave the apartment; an argument ensued with his wife and he slapped her; Boyd jumped up from the couch, brandished a knife, moved toward defendant, and invited him outside to fight; defendant then called the police; he next went into the kitchen, grabbed a knife and returned to the living room; a 10-minute argument ensued, after which defendant and Boyd started to leave;

defendant, however, changed his mind and refused to fight, but as he turned from the doorway, he thought Boyd was preparing to stab him so he plunged his knife into Boyd's back; he then ran out the door and continued to struggle with Knox and Wilson; however, when he observed a gun he hurried back into the apartment; he subsequently left the premises and was later arrested. Defendant also testified relative to an incident which occurred at the house of Betty Green two weeks before the subject altercation as follows: That he went to the Green residence to visit his wife and children; that his wife and Boyd were there playing cards together; that he upbraided his wife for playing cards in the children's presence and invited her downstairs to talk; that Boyd told Anne that she could refuse to go with defendant; that as defendant made reply to Boyd's remark the latter produced a knife and challenged him to a fight; and that he refused to fight Boyd.

### Applicability of the Dorado Rule

Defendant contends that the admission in evidence of the incriminating statements made by him to the police constitutes reversible error in view of the rule announced in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Following the decision of the United States Supreme Court in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], the California Supreme Court held in *Dorado* that a defendant's confession which was elicited under the following circumstances cannot be properly introduced in evidence: "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (Pp. 353-354.)

With respect to the requirement that an accused be advised of his right to counsel or to remain silent, the recent case of *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], holds that we cannot presume, in the face of a silent record, that the police informed the defendant of these rights. In *Stewart,* the Supreme Court also amplified upon the meaning of the first three elements of the *Dorado* rule. It was there stated that the critical or accusatory stage is

reached, entitling the suspect to counsel, when two conditions are met: (1) The officers have arrested the suspect, and (2) the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements. In amplifying upon the concept of an arrest, *Stewart* states that an arrest includes "custody," and that an arrest fulfills the first requirement of *Dorado* that the investigation has begun to focus on a particular suspect. Stating that, "beyond the 'focus' and custody, the accusatory stage matures upon the undertaking by the police of a 'process of interrogations that lends itself to eliciting incriminating statements' " (p. 578), *Stewart* holds that the proper test, in ascertaining whether this third requirement of the *Dorado* rule is fulfilled, is an objective one turning upon an analysis of "the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (P. 579.)

Adverting to the instant case, we first set forth the facts pertinent to defendant's claim. Several hours after the knifing of Boyd defendant telephoned the police and spoke to Officer Driscoll. Defendant identified himself as Joe Beverly and stated, as testified by Driscoll, that "he believed that he was wanted by the Police." Driscoll, who was attached to Headquarters Communications, testified that at the time he received this call he "knew of the case" and knew that the police were looking for a Joe Beverly, as he had received a teletype concerning such a person which he was about to read over the radio.[1] Driscoll testified that he therefore recognized the name of Joe Beverly and asked the telephone caller "why he believed he was wanted by the Police Department"; that the caller responded he had stabbed a man earlier in the evening, and when asked by Driscoll why he had stabbed this man replied as follows: That he and his wife were separated; that he went to his wife's home to deliver checks for child support payments; that he found a man in his house whom he had found there on a previous occasion and who, on that occasion, had pulled a knife on him; that consequently when he found this man in his home once again, he went directly into the kitchen, armed himself with a knife, and then ordered the man to leave; and that when the man didn't leave he stabbed him. Driscoll then asked the caller where he was,

---

[1] The record does not indicate the contents of the teletype message.

and upon being told, wrote it on a note and gave it to another officer who relayed the information over the radio to a police unit in the area. Driscoll then engaged defendant in a general conversation about his children until the telephone conversation was interrupted by a police officer who stated he had defendant in custody.

Defendant was taken in custody in the business office of a gas station by Officer Roberts. As Roberts entered the office defendant stated to him, " 'I'll be with you in a minute. I'm talking to the police.' " He continued talking and then handed Roberts the receiver, stating " 'Here, the policeman wants to talk to you.' " Roberts testified that he spoke to Driscoll and that when he hung up the telephone he "asked the defendant Beverly if he had been involved in an altercation that evening, where he had cut a man with a knife," and that defendant replied that "he had been involved in an altercation." When queried by Roberts as to what he had done with the knife, defendant pointed to a tool box in the office. In the tool box Roberts found a knife in a leather case and, in addition, an empty leather case. Roberts asked defendant where the knife belonging to the empty case was, defendant responding that he didn't know. Roberts noted a jacket lying on a chair and inquired of defendant if it was his. Defendant replied that it was, whereupon Roberts searched the jacket and found a knife identical to that in the tool case. Roberts then asked defendant "if this was the knife that he had used to cut the party with on that evening" to which defendant replied that it was.

Defendant was then removed from the gas station to the district police station where another conversation took place between Roberts and defendant in the presence of Officer Gray. With respect to this conversation Roberts testified that he "asked the defendant what the circumstances were involving his becoming involved in the cutting where he had stabbed a man with a knife"; that defendant stated that while he was visiting his wife, "four guys" tried to gain admission into the house; that one of them named Boyd asked him to step out; that he went back into the kitchen and secured the knife which Roberts had retrieved from his coat; and that as he was going out of the door Boyd pushed him and he at this time "hit him [Boyd] with the knife. . . ." Defendant was thereafter turned over to the custody of Inspector Asdrubale.

Asdrubale testified that en route to the Hall of Justice he engaged in a "cursory interrogation in regard to what had

occurred" stating as follows: "I said, 'Joe, tell me what happened there.' And he went through the thing, I couldn't say in a direct manner. He jumped all over the place. . . ." Upon arrival at the Hall of Justice defendant was interrogated by Asdrubale. Unknown to defendant this interrogation was tape recorded. The tape recording and 12 transcripts thereof were admitted at the trial. Although the trial court sustained the prosecutor's objection to defense counsel's question as to whether defendant was advised that he had the right to have an attorney, Asdrubale did answer in the negative when queried as to whether defendant was "advised as to any of his rights whatsoever."[2]

The tape recording consisted of questions by Asdrubale and answers by defendant. In response to Asdrubale's questioning defendant stated that he had visited his estranged wife's residence; that several persons were present including Boyd; that he and his wife had an argument whereupon he struck her in the face with a bottle; that Boyd then came at him with a knife, stating that defendant should fight him rather than his wife; that defendant then went into the kitchen and obtained a knife;[3] that he put the knife in his pocket and went back into the living room; that Boyd used vile language and again invited him to fight; that Boyd didn't know he had a knife; that he asked Boyd to leave; that he removed the knife from his pocket and opened it, at which time his wife ran behind Boyd for protection; that Boyd then put his knife away; that defendant then closed his knife; that he then telephoned the police and asked Boyd and three of his companions to leave; that Boyd invited him outside to fight; that he was behind Boyd as the latter was going outside the door with a knife in his hand; that as Boyd was going out of the door defendant "stabbed him in the back" twice; that he stabbed him because he was angry and because he believed that Boyd and his companions would "do me in" when he got outside;

[2]Motions to suppress the tape recording and to strike its contents on the respective ground of deprivation of due process and that the "confession" was "illegally obtained," were denied by the trial court after a *voir dire* relative to the circumstances under which the interrogation was conducted and the statement obtained. The *voir dire* disclosed that defendant was interrogated after a sleepless night, was given no food, and was not told that the interrogation was being taped. Excepting for the due process implications of the *Dorado* rule, no issue is raised on this appeal, nor is any claim of error made, as to the manner and method in which the interrogation was conducted.

[3]Defendant was shown a knife by Asdrubale which defendant identified as the knife he had obtained in the kitchen.

that Boyd and the other men ran out; that when defendant got outside one of the other men stated he was going to shoot him; that he believed that the man had a gun; that one of the men threw "something" at him; that he chased the men and they ran away; that he then went back into the house but left because his wife asked him to go and also because his wife told him the police were coming; that he walked around the general area; that someone fired a shot at him; that he returned to the house to get some keys; that no one was there; that he then caught a bus and went to the home of Stephanie Ann Hughes; that her sister opened the door and he stated to her "I killed a guy awhile ago"; that he then told Stephanie that he had "killed a guy . . . knifed him"; that he also told her he had shot a man, but was only "playing around" when he made this statement; that he showed her the knife; that when she stated she didn't believe him because there was no blood on the knife, he stated "I did stab a guy" and "I have a good feelin' I'm goin' to jail"; that he went to the gas station where he was employed and called the police, telling them that "I cut a guy; the guy was going to jump on me, so I stabbed him."

Having before us the contents of defendant's statements to the police, we begin our discussion of the applicability of *Dorado* to these statements by considering their legal effect, that is, whether they constitute confessions or admissions.

"A confession is a voluntary statement that was made by one who is a defendant in a criminal trial, at a time when he was not testifying in that trial, by which he acknowledged certain conduct of his own that constituted a crime for which he is on trial, a statement which, if true, discloses his guilt of that crime and excludes the possibility of a reasonable inference to the contrary." *(People* v. *Speaks,* 156 Cal.App. 2d 25, 34 [319 P.2d 709]; *People* v. *Ferdinand,* 194 Cal. 555, 568-569 [229 P. 341].) A confession "leaves nothing to be determined, in that it is a declaration of his [defendant's] intentional participation in a criminal act. . . ." *(People* v. *Ferdinand, supra,* pp. 568-569; see *People* v. *Fitzgerald,* 56 Cal.2d 855, 861 [17 Cal.Rptr. 129, 366 P.2d 481].)

"An admission as applied to criminal law is something less than a confession, and is but an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only toward the proof of the ultimate fact of guilt." *(People* v. *Ferdinand, supra,* p. 568.)

An admission relates to matters of fact that do not

involve criminal intent, while a confession is an acknowledgment of guilt. (*People* v. *Fowler,* 178 Cal. 657, 664 [174 P. 892]; *People* v. *Connelly,* 195 Cal. 584, 597 [234 P. 374]; *People* v. *Elder,* 55 Cal.App. 644, 646 [204 P. 29]; *People* v. *Kristy,* 111 Cal.App.2d 695, 715 [245 P.2d 547].)

■ When a statement of guilty conduct is such that it contains only facts from which guilt may be inferred or facts amounting to a claim of innocence or justification or excuse for the defendant's acts, it is an admission rather than a confession. (*People* v. *Elder, supra,* p. 647; *People* v. *Luzovich,* 127 Cal.App. 465, 469 [16 P.2d 144]; *People* v. *Fowler, supra,* pp. 664-665; *People* v. *Wilkins,* 158 Cal. 530, 534-535 [111 P. 612].) In *Luzovich,* even though the defendant's written statement concerning the manner in which he committed the homicide acknowledged that he shot and killed his father, this statement was admitted in evidence as an admission and was held not to constitute a confession because, throughout the statement the defendant insisted that he acted in necessary self-defense to prevent the deceased from attacking him with a knife. In *Fowler,* a statement made by a defendant in a murder case that he "killed" the deceased by blows on the head with a club, coupled with a declaration that the deceased, at the time, threatened to kill the defendant and that the latter then believed that the deceased had a pistol in his hands with which he was about to shoot the defendant, and that with that belief defendant struck the fatal blow, was held not to be a confession, but an admission. The Supreme Court there stated as follows: "Such an admission . . . is not a confession of the crime, or an acknowledgment of guilt thereof. It is a declaration of innocence; that no crime was committed; that the killing of Duree was a justifiable homicide and not murder or manslaughter." (P. 666; see also *People* v. *Kristy, supra; People* v. *Connelly, supra.*)

In *Dorado,* it was held that the improper introduction into evidence of a confession which has been obtained in violation of the constitutional right to counsel results in a denial of due process and that accordingly the error is necessarily prejudicial so as to preclude the application of the harmless error rule. ■ *Dorado* does, however, contain the following statement: "Although under some circumstances the introduction into evidence of statements obtained from a defendant during police interrogation in violation of his right to counsel and his right to remain silent *may constitute harmless*

*error,* we are convinced that the error is necessarily prejudicial when the statements are confessions.'' (P. 356; emphasis added.) We interpret this statement to mean that in the case of admissions the harmless error rule announced in *People* v. *Watson,* 46 Cal.2d 818, 835-838 [299 P.2d 243], and applied with due regard to the provisions of article VI, section 4½, of the California Constitution, is applicable.

Turning to the facts of the present case once again, we find that defendant made four separate statements to the police: One to Officer Driscoll, two to Officer Roberts, and one to Inspector Asdrubale.[4] Defendant was not informed by the police of his right to counsel or of his right to remain silent prior to the making of these statements. Accordingly, we must now analyze each of these statements in the light of the *Dorado* rule, and, where pertinent, with regard to the foregoing principles applicable to confessions and admissions.

 With respect to the incriminatory statements made to Driscoll, regardless of whether they amounted to a confession or were, instead, admissions of material facts, we are convinced that they were not obtained in violation of the *Dorado* rule. Although it may be inferred that at the time defendant made these statements the investigation had begun to focus on him—since Driscoll knew that the police were looking for a person named Joe Beverly—he was neither under arrest nor in custody at this time. Nor can it be said that Driscoll was carrying out ''a process of interrogations that lends itself to eliciting incriminating statements.'' As stated in *Stewart,* in deciding whether such an interrogation has taken place the determination must be made upon the objective evidence and upon an analysis of ''the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.'' (P. 579.) In the present case there is nothing in the record to show that Driscoll knew any of the circumstances of the crime charged except that a Joe Beverly was wanted by the police. That Driscoll was not carrying out the ''process of interrogations'' delineated in *Dorado* and *Stewart* is apparent from the nature of his questions and particularly from his inquiry of defendant as to

---

[4]The record discloses that defendant also made a statement to Asdrubale while en route to the Hall of Justice. Asdrubale did not testify as to the nature of the statements, but merely referred to it as a ''cursory interrogation'' stating ''he went through the thing. . . . He jumped all over the place. . . .''

why he believed he was wanted by the police. ▮ It is plain, moreover, that an interrogation over the telephone in connection with a call initiated by defendant himself is not the "process of interrogations" delineated and defined in *Dorado* and *Stewart*. Accordingly, we have an absence of the two conditions prescribed by *Stewart* which give rise to the accusatory or critical stage entitling the suspect to counsel, that is, an arrest and the " 'process of interrogations that lends itself to eliciting incriminating statements.' " (P. 577.) The subject statements fall, in our opinion, into the category of unsolicited statements obtained without coercion. Such statements were held in *Dorado* to be admissible and not proscribed by the rule announced therein.

▮ With regard to the statements made to Roberts at the gas station we likewise conclude that they were not obtained under the conditions proscribed by the *Dorado* rule, and were, accordingly, properly admitted in evidence. Although defendant was in custody when he made the subject statements, the accusatory or critical stage had not yet been reached because the police were not then carrying out "a process of interrogations that lends itself to eliciting incriminating statements." Considering the brevity of the interrogation, the fact that it took place at the gas station premises immediately after defendant was taken into custody, the nature of the questions asked, and the conduct of the police officers, it is apparent that the interrogation was not carried on for the purpose of eliciting a confession, but rather that it was incident to the investigatory stage. It is apparent that Roberts knew that defendant was a suspect in a stabbing incident Acting reasonably upon information furnished him he placed defendant in custody. Under such circumstances Roberts was justified in inquiring of defendant if he had been involved in an altercation "where he had cut a man with a knife," and upon receiving an affirmative answer to inquire what defendant had done with the knife. Upon finding two knives, one in a tool box and another in defendant's jacket, it was properly within the bounds of the investigatory process to inquire if the latter knife was the one used in the altercation. While defendant's answers may have been incriminatory they were not elicited as the result of accusations put to him or as a result of a "process of interrogations." In the connotation used the term "process" suggests a *series* of events which are directed toward a particular result or end, that is, the eliciting of a confession.

*Stewart* exemplifies the type of situation which falls within the ''process of interrogations'' condition of the *Dorado* rule. There the defendant was under arrest when he confessed, had been in custody five days, and was interrogated daily and in an accusatory atmosphere.[5] In analyzing the total situation the Supreme Court's rationale was as follows: ''Such extensive interrogations during the period of defendant's incarceration could serve no other purpose than to elicit incriminating statements.'' (P. 579.) In *United States* v. *Konigsberg,* 336 F.2d 844, cited by *Stewart,* the reviewing court held that there was no ''process of interrogations'' designed to elicit a confession under the following circumstances: Federal agents apprehended the defendants in a garage containing stolen goods, arrested them and took them to the bureau's office where, prior to an arraignment, the agents asked Konigsberg '' 'why he was in this garage and just what had taken place ... and ... if he wished to cleanse himself or explain ... what his reasons for being there were, why the other individuals were there.' '' (P. 852.) Konigsberg then made some incriminating statements. The court stated: ''The uncontradicted purpose of the discussion was to give Konigsberg a chance to explain his presence in the garage if he could; to hear Konigsberg's side of the story.... If Konigsberg or any of the other people caught in the garage could account for their presence this was their opportunity.'' (P. 853.)

The statements made later by defendant to Roberts at the district station were made under circumstances similar to those described in *Konigsberg.* At this time Roberts asked defendant ''what the circumstances were involving his becoming involved in the cutting where he had stabbed a man with a knife.'' This interrogation was not per se indicative of a purpose to elicit a confession. Its tenor was equally consistent with the purpose of obtaining defendant's side of the story, which explanation defendant proceeded to give. Under the circumstances and in the light of the test described by *Stewart* the subject interrogation did not amount to ''a process of interrogations that lends itself to eliciting incriminating statements.'' Assuming *arguendo,* that the accusatory or critical stage had been reached when Roberts asked this question, the statements made by defendant did not amount to a confession so as to make the error prejudicial per se. The statements did not constitute an admission of guilt but were statements of

---

[5] A police officer testified he entered the interrogation room and said to the defendant '' 'Roy, you killed that old woman. . . .' '' (P. 579.)

justification and excuse, which, if true, might support the plea of self-defense. Thus, the incriminating statements were, at worst, an admission of material facts. Whether the error in admitting them was prejudicial depends upon our analysis of the entire case under the rule announced in *Dorado*, an analysis we shall hereinafter make.

With respect to the statements made to Asdrubale, all of the conditions of the *Dorado* rule had been fulfilled. Defendant was not only under arrest at the time he made the statements, but they were obtained as the result of an extensive interrogation and were recorded and taped without defendant's knowledge. Under these circumstances, and in view of the nature of the questions asked, it is obvious that the purpose was to elicit a confession.[6] The subject statements, however, did not amount to confession. Although defendant acknowledged the stabbing he persistently claimed that it was done in self-defense. Accordingly, they were admissions and their prejudicial effect, if any, must likewise be evaluated in the light of the *Watson* rule. (46 Cal.2d 818.)

### The Sending of Transcripts of the Tape Recording Into the Jury Room

When the tape recording of defendant's statements to Asdrubale was played before the jury, the jurors were each handed a transcript of the recording to assist them in following it. The tape recording was admitted in evidence but the transcripts were only marked for identification. After the jurors had retired to the jury room to deliberate they requested several exhibits, including the tape recording and the transcripts. Counsel for defendant stated to the court that he preferred to have the transcripts of the tape recording go into the jury room rather than the tape recording itself, because it would consume much time to listen to the entire tape. Defense counsel then stipulated that the transcripts which had been previously marked for identification only could be admitted into evidence subject to the same objections he had made during the trial to the tape recording.[7] It was also stipu-

---

[6] Many of Asdrubale's questions were made in an accusatory manner and on occasion he stated to defendant that he did not believe defendant was telling the truth.

[7] It follows from our earlier discussion that since these transcripts were made from a tape recording which was erroneously admitted into evidence under *Dorado*, they too were improperly put before the jury on this basis. This error, however, is subject to the same prejudicial error rule as is applicable to the admission into evidence of the tape

lated by defendant's counsel that the transcripts could be taken into the jury room.

Defendant does not assign as error the giving of the transcripts to the jury in order to help them understand the recording while it was being played. The propriety of such a procedure is well established. (*People* v. *Wojahn,* 169 Cal. App.2d 135, 146 [337 P.2d 192].) ▆ Defendant does however, argue that it was error for the trial court to allow the jury to take these transcripts with them into the jury room. For two reasons defendant's contention is without merit. Firstly, the law allows the jury to take with them into the jury room all exhibits except depositions. (Pen. Code, § 1137; *People* v. *Horowitz,* 70 Cal.App.2d 675, 704 [161 P.2d 833].) A tape recording of the defendant's confession, which was introduced into evidence, was held in *People* v. *Walker,* 150 Cal.App.2d 594, 603 [310 P.2d 110], to be within the scope of this rule. In the instant case the transcripts of the tape recording, introduced in evidence, were sent into the jury room instead of the tape recording. We perceive no distinction between the recording and its transcription. ▆ Moreover, defense counsel stipulated that the transcripts could be taken into the jury room during deliberation. Such a stipulation amounts to a waiver of all objection to such procedure. (*People* v. *Lewis,* 186 Cal.App.2d 585, 600 [9 Cal. Rptr. 263]; *People* v. *Mahoney,* 77 Cal. 529 [20 P. 73].) In *Lewis,* a prosecution for murder, it was urged on appeal that the trial court erred in allowing the jury to take into the jury room for examination during their deliberation a transcript of testimony of a doctor who had performed an autopsy on the victim's body. The appellate court held that such a procedure was not error in view of the fact that the defendant's counsel, in the defendant's presence, stipulated that such procedure could be followed, rather than having the transcript read to the jury by the court reporter. Defense counsel's stipulation in the instant case was consistent with the rule that an attorney has implied authority to enter into stipulations affecting procedure in the trial as distinguished from those that pertain to the cause of action alone. (*People* v. *Hanna,* 36 Cal.App.2d 333, 336 [97 P.2d 847].) ▆ Consequently, a procedural irregularity once waived cannot be asserted on appeal. (*People*

recording itself. Accordingly, the propriety of the use by the jury of the transcripts hinges on our determination of whether under the *Watson* rule the admission of defendant's statements to Asdrubale constituted harmless or prejudicial error.

v. *Wilson,* 78 Cal.App.2d 108, 120 [177 P.2d 567]; *People* v. *Kobey,* 105 Cal.App.2d 548, 560 [234 P.2d 251].)

### *Evidence That Defendant Was a Bigamist*

In the course of his interrogation by Asdrubale defendant stated that he was married to two women; that Anne was his first wife; and that in January of the previous year he had married Stephanie Hughes without having obtained a divorce from Anne. He also stated that he stayed with Stephanie " 'bout every other night. . . ." On cross-examination defendant was queried concerning his relationship with Stephanie. Objections to these questions were overruled.[8] The relationship between defendant and Stephanie was also alluded to by the prosecutor in his argument to the jury.[9]

Defendant contends that in admitting evidence of his relationship with Stephanie the trial court committed prejudicial error because such evidence amounted to an attempt to impeach him by showing that he was a person of bad moral character and that he had committed independent wrongful acts having no tendency to prove a material fact in connection with the particular crime charged. The People assert that the evidence of defendant's bigamous life was relevant to the question of the intent with which he acted, and relevant to overcoming defendant's defense of justifiable homicide.

---

[8]"MR. MAURER: [The Prosecutor] Didn't you marry her? THE WITNESS: I think this should be objected to. I am not in on this case. That shouldn't be in here at this time. MR. DAVIS: [Counsel for defendant] I object as incompetent and irrelevant at this time. THE COURT: Objection overruled. Answer the question. THE WITNESS: No, not exactly. . . . Q. Didn't you marry her in January of last year? A. Marry her? Q. Yes, sir. A. Not legally; any time you stay with anybody in the State of California more than six months it's married, you know, but it's not legally married. Q. Well, you have children by her? A. Yes, I do. MR. DAVIS: I am going to object to this entire line of questioning on the grounds it's beyond the scope of direct examination. THE COURT: The objection is overruled. I think it has been explored. MR. DAVIS: Further on the grounds it's incompetent, irrelevant and immaterial. THE COURT: Objection is overruled. I think it's been explored sufficiently, Mr. Maurer. MR. MAURER: All right, Your Honor."

[9]In its argument to the jury the prosecution stated: "Now, Mr. Davis, at numerous times in his argument to you kept referring to his home as his castle, that the witnesses who were there, the male witnesses who were there, were trespassers, that he was defending his home. What home? What castle? Mr. Beverly apparently has two castles. Which one was he defending? Was he there where he had no right to be? All of the witnesses testified, when he makes the complaint to his wife, 'Well, you don't live here; you have no right to complain.' Isn't that what the testimony was? He is married to Ann Beverly. He has children by her. He is married to Stephanie Beverly, he has children by her. She lives at 1181 Pierce. She tells Inspector Asdrubale she lives at 2404 Bush, around the corner. He has got three castles."

720

Evidence of other offenses is generally inadmissible, unless it is relevant for some purpose other than to show disposition to commit crime. (*People* v. *Cancimilla,* 197 Cal.App. 2d 242, 252 [17 Cal.Rptr. 498]; *People* v. *Whipple,* 192 Cal. App.2d 179, 186 [13 Cal.Rptr. 378]; Witkin, Cal. Evidence, § 135, p. 158; Code Civ. Proc., § 2051.) For example, evidence of other offenses is admissible to show motive, intent, knowledge, and to show a common plan or scheme. (*People* v. *Ryerson,* 199 Cal.App.2d 646, 651 [19 Cal.Rptr. 22]; *People* v. *Malloy,* 199 Cal.App.2d 219, 230-231 [18 Cal.Rptr. 545].)

Moreover, evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. (*People* v. *Peete,* 28 Cal.2d 306, 314-315 [169 P.2d 924]; *People* v. *Malloy, supra,* p. 230.) " 'The general tests of the admissibility of evidence in a criminal case are: ... does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' " (*People* v. *Peete, supra,* p. 315.)

In the case at bench, the evidence relative to defendant's bigamous relationship does not come within any of the excepted categories of the general rule. Therefore, it was error to admit this evidence. The People argue that the challenged evidence was admitted to show defendant's intent, that is, that he acted with malice aforethought. This argument is without merit because there was no connection between the bigamy and the alleged murder which would make the evidence relevant to show intent. In addition, in order to draw the inference that a defendant had the requisite intent to commit the charged crime from the fact that he committed a collateral uncharged offense at another time, there must be a showing of similarity of circumstances between the two crimes. Otherwise, proof of the collateral offense serves no purpose other than to show the disposition of the defendant to commit crimes. (*People* v. *Burns,* 109 Cal.App.2d 524, 536-537 [241 P.2d 308, 242 P.2d 9]; *People* v. *Nazzaro,* 223 Cal. App.2d 375, 379 [35 Cal.Rptr. 879]; *People* v. *MacEwing,* 216 Cal.App.2d 33, 48-49 [30 Cal.Rptr. 476].) In this case the prosecution made no attempt to show similarity of circumstances between the crimes, and the statement in the People's brief that such evidence was admissible to show

intent, unsupported by authority or logic, cannot be sustained.

The prosecution's argument that the subject evidence was admissible to rebut defendant's defense of justifiable homicide is likewise without merit. The People argue that the evidence of defendant's bigamy was admissible because defendant was urging the defense of his habitation, and, consequently, the evidence was used to show that the habitation he was allegedly defending was not his own. A reading of the record convinces us that this is not a situation wherein defendant raised the defense of habitation. Boyd and his companions were guests of defendant's wife, not intruders. They were admitted into the house, and were not attempting to damage or destroy or steal defendant's or his wife's property. In addition, the instructions on justifiable homicide given by the trial court involved defense of the person only and did not include instructions bearing on the defense of habitation. Since defendant neither challenges the sufficiency of the instructions on appeal nor did he request the trial court to give instructions relative to the defense of habitation, we conclude that, contrary to the suggestion in the People's brief, defendant did not raise the defense of habitation during the trial. Defendant did however raise the defense of person and the court so instructed the jury. It simply belies logic to hold that evidence of a person's immoral behavior can be admitted against him when he raises the defense of his person. The People's brief implies such a result, and in the interests of a rational legal system, no such rule of evidence should be countenanced.

As was said in *People* v. *Baylor*, 47 Cal.App.2d 34, 38-39 [117 P.2d 425] : ''Other acts of criminality or immorality cannot be dragged into the case for the purpose of arousing an atmosphere of prejudice against the defendant or to create a probability of his guilt of the charge of which he is on trial.''

We are of the opinion, therefore, that the bigamy evidence, compounded by the prosecutor's reference to it in his argument, had the effect, in the instant case, of casting defendant in the role of an unseemly person, and served in no way to prove any element of the murder charge or to rebut defendant's defense of justifiable homicide.[10] This evidence,

---

[10]The prosecutor also made reference to the fact that defendant was not supporting his children. Over objection he was permitted to indulge in the following cross-examination: ''Q. You are supporting these children that you speak about, Mr. Beverly? A. Yes, I am. Q. They are on Welfare, aren't they? . . . THE WITNESS: I did give her the money and she doesn't report it. That's her fault.''

therefore, should have been excluded as irrelevant to the issues before the jury.[11]

### The Watson Rule

It is the constitutional obligation of an appellate court to declare a miscarriage of justice ''only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'' (*People* v. *Watson, supra,* 46 Cal.2d 818, 836; Cal. Const., art. VI, § 4½.) Upon an examination of the record in this case we conclude that it cannot be said that there was a miscarriage of justice, since it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. The record points emphatically to defendant's guilt. His version of the occurrence is opposed by the abundant testimony of four eyewitnesses. In addition, the record properly contains the admissions which defendant made in his statement over the telephone to Driscoll to the effect that defendant stabbed Boyd, as well as his statements to Roberts at the gas station.

Although we are of the opinion that defendant's statements to Roberts at the district station that he stabbed Boyd were properly admitted in evidence, assuming *arguendo,* that it was error to admit them, such error was harmless. These statements, as well as the erroneously admitted statements made to Asdrubale, are exculpatory in nature. These statements may be regarded as a justification or excuse for the stabbing since they expressly negatived that defendant's conduct was accompanied by criminal intent. They amount to an acknowledgment of the stabbing accompanied by a claim that the homicide was committed in self-defense. This is the exact theory upon which defendant based his defense at the trial and upon which he sought to justify the killing when he became a witness in his own behalf. The statements made to Roberts and Asdrubale were reiterative of the claim which defendant persisted in from the time he telephoned to

---

[11]It should be here pointed out that this error is predicated on the ground of irrelevancy. Although the bigamy evidence was part of a statement which was made under the circumstances proscribed by *Dorado,* the admission of such evidence was not violative of the *Dorado* rule because it was not a confession of a crime with which defendant was charged in the instant case, nor an admission of a material fact or facts tending toward proof of the guilt of such crime; rather it was a confession or admission of another offense.

the police, and throughout the trial—a claim voluntarily and spontaneously injected into the case by defendant himself.

These statements, moreover, would tend to overcome any implication that defendant's statements to Driscoll and those made to Roberts at the gas station, which we have held were properly admitted, were confessions. Under the circumstances, therefore, we fail to see that defendant was prejudiced by the admission in evidence of the admissions obtained in violation of the *Dorado* rule.

█ Adverting to the error in admitting the bigamy evidence, although we do not approve of the failure of the trial court and the prosecutor to adhere to the applicable rule of evidence, the fact that such error was committed does not necessarily require a reversal. █ As stated in *People* v. *Stinson,* 214 Cal.App.2d 476, 482 [29 Cal.Rptr. 695]: "Improper evidence of prior offenses results in reversal only where the appellate court's review of the trial record reveals a closely balanced state of the evidence. [Citations.] The same error, viewed in the light of a record which points convincingly to guilt, is consistently regarded as nonprejudicial. [Citations.]"

█ The fact that the trial court did not instruct the jury to disregard the offending information, or that it did not give an instruction limiting the probative value of the evidence, does not compel a reversal in the light of the overwhelming evidence of guilt. (See *People* v. *Cavanaugh,* 44 Cal.2d 252, 265 [282 P.2d 53]; *People* v. *Guiterrez,* 152 Cal.App.2d 115, 122-123 [312 P.2d 291]; *People* v. *Epstein,* 21 Cal.App.2d 488, 490 [69 P.2d 454]; *People* v. *Hamet,* 69 Cal.App.2d 546, 548 [159 P.2d 702].) It should also be pointed out that, aside from the objections interposed while defendant was under cross-examination, no other objections were interposed to the evidence of defendant's bigamous conduct. Defendant's marital status was first injected into the record by way of the tape recording. While an objection was made that defendant did not receive due process and that this piece of evidence was illegally obtained, no further objection was made with respect to the contents of the tape after the trial court determined that the statement was voluntarily made.[12] Nor was any objection or assignment of error made as to the prosecutor's remarks in the course of his argument. █ It is well established that a defendant cannot raise an objection to the introduction

---

[12]Defense counsel asked for a recess in order that he might read the transcript of the tape recording to determine if there were "any conclusions or statements that I feel are objectionable. . . ."

of evidence for the first time on appeal. (*People* v. *Herrera,* 209 Cal.App.2d 748, 752 [26 Cal.Rptr. 409].) This rule is applicable to failure to object to the admission of evidence of an uncharged crime. (*People* v. *Marsh,* 58 Cal.2d 732, 747 [26 Cal.Rptr. 300, 376 P.2d 300] ; *People* v. *Descant,* 51 Cal. App.2d 343, 349 [124 P.2d 864] ; *People* v. *Henson,* 205 Cal. App.2d 636, 638 [23 Cal.Rptr. 149].) ▮ With respect to the misconduct of a district attorney which tends to and is likely to result in prejudice to a defendant, the general rule is that where no objection is made to such conduct by the defendant, such misconduct will not furnish grounds sufficient to justify the reversal of a judgment. There are two exceptions to this rule. One is where the case is closely balanced and there is grave doubt of the defendant's guilt; the other is where the act done or remark made is of such character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court. (*People* v. *Berryman,* 6 Cal.2d 331, 337 [57 P.2d 136].) ▮ As we have hereinabove pointed out, this is not a close case where there is grave doubt of defendant's guilt. Nor was the effect of the prosecutor's remarks so damaging to defendant that it could not have been cured by retraction of counsel or by an appropriate instruction of the court. We conclude therefore, that because of the failure of defense counsel to interpose a timely objection to the prosecutor's remarks the misconduct claimed to be prejudicial will not furnish grounds sufficient to justify a reversal of the judgment. (See *People* v. *Berryman, supra,* p. 337 ; *People* v. *Swayze,* 220 Cal.App.2d 476, 495 [34 Cal.Rptr. 5].)

The judgment is affirmed.

Sullivan, P. J., and Bray, J.,* concurred.

A petition for a rehearing was denied May 5, 1965, and appellant's petition for a hearing by the Supreme Court was denied June 16, 1965. Peters, J., was of the opinion that the petition should be granted.

---

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.