[Crim. No. 9879.   Second Dist., Div. Two.   May 19, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. KENNETH EARL FORD, Defendant and Appellant.

Robert W. Armstrong, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

FLEMING, J.—Kenneth Ford was convicted of unlawfully taking and driving an automobile (Veh. Code, § 10851), but was acquitted of grand theft of an automobile (Pen. Code, § 487, subd. 3). Four prior felony convictions (larceny of auto, Oklahoma, 1950; burglary, Oklahoma, 1950; burglary, California, 1953; burglary, California, 1958) were admitted before trial.

The principal issue on appeal is whether questioning of a suspect by the police had ceased to be investigatory and become accusatory so that the accused should have been advised of his right to remain silent and his right to counsel under the rule of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

On the morning of November 27, 1963, Mrs. Mary Pennario, a resident of Los Angeles, awoke to discover missing her blue 1960 Plymouth automobile, license number JLX 026. Her house had been entered during the night, the keys to her automobile taken, and certain personal property had been stolen. Mrs. Pennario had not given anyone permission to take her car.

At 1 a.m. on November 29 a deputy sheriff in Modesto cited the defendant Ford for driving without a license in a blue 1960 Plymouth, license number JLX 026. Ford was asked who the registered owner of the car was, and at first said the car belonged to his sister, but when asked his sister's name he could not give it and then said the car belonged to a girl friend or a friend of a girl friend. After receiving the citation Ford was allowed to go on his way.

At 11:45 p.m. on the same day, November 29, in Bakersfield, Police Officer John Burum and a fellow-officer observed Ford in the driver's seat of a blue 1960 Plymouth, license number JLX 026, double-parked with the motor running. On checking the license number, the officers learned the car had been reported as a stolen car by the Los Angeles Police Department. In a brief conversation Ford was asked who owned the vehicle. He replied that it was registered to Mary Pennario, but he did not know her address. Ford was then told the car had been reported as stolen. To this he said nothing. Ford was arrested and taken to the Bakersfield police station by the two officers and there questioned by Officer Burum and another officer. During this questioning Ford said he had borrowed the car in Watts from a friend named Mike, he knew it was hot but he had not taken the car initially, he had driven to Oakland and was returning to Los Angeles. This conversation took place shortly after the arrest and lasted 30 to 40 minutes. On its conclusion Ford was placed in custody in the Bakersfield county jail, and the auto was impounded.

On December 3, 1963, William McMonagle, a police officer from Los Angeles who was the investigating officer in the Pennario case, picked up Ford in Bakersfield to take him to Los Angeles. In Bakersfield Ford told Officer McMonagle he had known the car was stolen but he had not taken it. On the way to Los Angeles during a conversation of some duration Ford again said he had known the car had been stolen, that he would take the rap for the stolen car but not for

the burglary. He had gotten the car from a man named Mike in Watts, and had been to Oakland twice, and to Bakersfield about three times, and was on his way back to Los Angeles at the time of his arrest. Ford also said that on his first trip through Bakersfield he had been loaded, i.e., carrying illegal merchandise.

On December 5, 1963, a later conversation between Officer McMonagle and Ford was tape-recorded at the Los Angeles police station, and part of this conversation in which Ford said it was a good thing that he had not been stopped on his first trip because he had been loaded was played to the jury during the cross-examination of the defendant. Defendant's objection to this evidence was overruled.

### Right to Counsel and Right to Remain Silent

*People* v. *Dorado,* 62 Cal.2d 338, 354 [42 Cal.Rptr. 169, 398 P.2d 361], held that when a police investigation has become an accusatory one, "that is, when it has begun to focus on a particular suspect, the suspect has been taken into police custody, and the police have carried out a process of interrogations that lends itself to eliciting incriminating statements," then the police must inform the person accused of his right to counsel and his right to remain silent. If the warning has not been given the the accused's statements are not admissible in evidence.

In this case we are concerned with the admissibility in evidence of two different sets of questionings, a later set with the Los Angeles police and an earlier set with the Bakersfield police.

■ With respect to the later questionings by the Los Angeles police, Ford should have been advised of his constitutional rights as outlined in *People* v. *Dorado.* The questioning of Ford on the way to Los Angeles four days after his arrest and his subsequent questioning in Los Angeles took place at a time when the inquiry had focused on Ford as an accused, and the presence of a tape-recorder on the latter occasion suggests that the primary purpose of these talks was to elicit incriminating statements from him for use in a subsequent prosecution. A warning to the prospective defendant that he was entitled to counsel and need not answer questions should have been given prior to such questionings. ■ Since there was no showing that Ford had been so warned, any incriminating statements secured from him on

these occasions should have been excluded from evidence. (*People* v. *Dorado,* 62 Cal.2d 338, 353 [42 Cal.Rptr. 169, 398 P.2d 361] ; *People* v. *Modesto,* 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753] ; *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97].)

■ However, the earlier questioning by the Bakersfield police at the station immediately following the arrest took place during a different stage of the proceedings. Although Ford was under arrest on suspicion of car theft, there is nothing to suggest the arresting officers were conducting ''a process of interrogations'' in an accusatorial manner designed to make him confess. At that point it appears the arresting officers were still trying to find out whether a crime had actually been committed and whether Ford should be held to answer for it. In pursuing their investigations they were entitled to ask questions, even of suspects. ■ ''Nothing that we have said, of course, should be interpreted to restrict law enforcement officers during the investigatory stage from securing information from one who is later accused of the crime or from obtaining answers to their questions. . . . ■ Only when the investigatory stage has become an accusatory one, that is, when it has begun to focus on a particular suspect, the suspect has been taken into police custody, and the police have carried out a process of interrogations that lends itself to eliciting incriminating statements, does the doctrine of *Escobedo* apply and the confession given without the required warning or other clear evidence of waiver become inadmissible evidence.'' (*People* v. *Dorado,* 62 Cal.2d 338, 354 [42 Cal. Rptr. 169, 398 P.2d 361].)

In applying the *Dorado* rule here the critical distinction is that between investigation and accusation, between questioning designed to obtain information and questioning designed to secure a confession. (*Escobedo* v. *Illinois,* 378 U.S. 478, 485, 492 [84 S.Ct. 1758, 12 L.Ed.2d 977].) ■ The authority of the police and the obligation of the citizen differ sharply in each stage. In the investigatory stage the police are fully entitled to question all persons from whom information may be derived. All citizens are under a statutory duty to assist the police authorities in maintaining the peace and in suppressing crime, a duty which goes back hundreds of years in the common law (Gov. Code, §§ 26600, 26602, 26604; Pen. Code, § 150), and which, by implication at least, includes the furnishing on request of information about crime to

488

the public authorities.[1] ▮ The Constitution does not prohibit solicitation of information by the police from a suspect, even one under restraint. Investigatory questioning by the police of a person under restraint is sanctioned by case law (*People* v. *Mickelson,* 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Martin,* 46 Cal.2d 106 [293 P.2d 52]; *People* v. *Blodgett,* 46 Cal.2d 114 [293 P.2d 57]), and by statute (Cal. Pen. Code, § 849, subd. (b)(1); New York Code of Crim. Proc., § 180(a) (adopted 1964)), and is a part of law enforcement procedure which benefits both the police and the person restrained, who when given a ready opportunity to explain suspicious circumstances may quickly clear himself and avoid the stigma of a public charge of crime. (*Police Practices and the Law,* by Edward L. Barrett, Jr., 50 Cal.L.Rev., pp. 11, 30, 46; 3 Wigmore on Evidence (3d ed.) pp. 319, 360.)

▮ However, when questioning has ceased to be investigatory and has become accusatory then police solicitation of information is now sharply circumscribed. The police are no longer encouraged to solicit information but are discouraged from so doing, and the accused in turn is discouraged from further uncounseled conversation with the police. The policy of the law reverses itself, and the privilege of an accused against self-incrimination and to be advised by counsel supersedes the duty of a citizen to assist the police in suppressing crime. ▮ The accused must be warned he need not say anything. ▮ The accused must be told that he has the right to counsel. ▮ The accused must sufficiently comprehend his situation to make a rational decision whether to avail himself of his right to be silent and his right to counsel. (*People* v. *Stewart,* 62 Cal.2d 571, 581 [43 Cal. Rptr. 201, 400 P.2d 97].) ▮ The purpose of these restrictions on interrogation is, fundamentally, to eliminate conditions which invite coerced confessions, a purpose made clear in *Escobedo* and *Dorado,* and articulated in the opinion of *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], in which the California Supreme Court referred to coercion no less than 17 times.

---

[1]"1612. Sir Francis Bacon, in the Countess of Shrewsbury's Trial, 2 How. St. Tr. 769, 778: 'You must know that all subjects, without distinction of degrees, owe to the king tribute and service, not only of their deed and hand, but of their knowledge and discovery. If there be anything that imports the king's service, they ought themselves undemanded to impart it; much more, if they be called and examined, whether it be of their own fact or of another's, they ought to make direct answer.' '' (8 Wigmore on Evidence (3d ed.) § 2190, p. 60.)

It is apparent that more is involved than the creation of yet another ceremonial formula, which once recited permits things to go on as before. A purely formalistic view of the distinction between the investigatory and the accusatory stage misses the mark and would be a misleading guide to the disposition of future cases. It seems reasonably clear from a reading of *Dorado* and *Escobedo* that once the accusatory stage has been reached, any perfunctory advice covering an accused's right to counsel and right to remain silent will receive a most critical inspection from the courts, and only statements of a prospective defendant who confesses with full advice as to his rights, with full comprehension of what they consist, with full appreciation of the consequences of his conduct, and with an unconditional desire to do so, are likely to successfully navigate the narrow channel into admissible evidence. It is also reasonably clear that our higher courts intend to encourage the use by an accused of his right to counsel and right to remain silent, even though such use of his constitutional rights may reduce the effectiveness of law enforcement. (*Escobedo* v. *Illinois,* 378 U.S. 478, 490 [84 S.Ct. 1758, 12 L.Ed.2d 977].)

■■■ While the full implications of *Escobedo* and *Dorado* have not yet been developed by the courts, it logically follows that if an accused in custody is deemed to have the same status as a defendant under indictment, as the United States Supreme Court has stated he has (*Escobedo* v. *Illinois,* 378 U.S. 478, 485, 486 [84 S.Ct. 1758, 12 L.Ed.2d 977]), then if indigent he is entitled to the appointment of counsel in order that there be no invidious discrimination between rich and poor.[2] (*Gideon* v. *Wainwright,* 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733] ; *Douglas* v. *California,* 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811].) ■■■ If an accused has the status "for all practical purposes" of a man under indictment, as the United States Supreme Court has stated he has (*Escobedo* v. *Illinois,* p. 486), it also follows that he cannot be questioned in the absence of his to-be-

---

[2] "Thus, once the right to counsel attaches, however the test be phrased, a suspect without a lawyer probably would have to be advised of this right and given an opportunity to retain counsel. For the indigent, counsel would have to be appointed, or at least he would have to be advised that he has a right to appointed counsel. Any confession obtained from a person at the 'accusatory' stage without complying with these procedures, would be suppressed as obtained in violation of the accused's right to counsel." (Enker and Elsen, *Counsel for the Suspect: Massiah* v. *United States and Escobedo* v. *Illinois* (1964) 49 Minn. L.Rev. 47, 78.)

appointed counsel (*Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]). In California once the accusatory stage has been reached, this process comes into play whether the accused has requested counsel or not (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]), and can only be waived by an accused who has full appreciation and understanding of the consequences of what he is doing. (*Carnley* v. *Cochran,* 369 U.S. 506 [82 S.Ct. 884, 8 L.Ed.2d 70]; *People* v. *Stewart,* 62 Cal.2d 571, 581 [43 Cal. Rptr. 201, 400 P.2d 97].) We do not think we overstate when we suggest that under these rules the admission in evidence of confessions obtained by police questioning in the accusatory stage will be the rare exception rather than the rule.

▮▮▮▮ By reason then of the severe limitation, almost amounting to prohibition, placed on police questioning once the accusatory stage has been reached, it becomes important to law enforcement not to classify a suspect prematurely within the accusatory stage in order that legitimate investigation by the police may not be balked, for as put by Mr. Justice Traynor, concurring, in *People* v. *Garner,* 57 Cal.2d 135, 164 [18 Cal.Rptr. 40, 367 P.2d 680], "So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admission during interrogation."; and as said by Mr. Justice Frankfurter in *Culombe* v. *Connecticut,* 367 U.S. 568, 571 [81 S.Ct. 1860, 6 L.Ed.2d 1037], "Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly begun—but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it.

"The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the persons questioned. Or they may become the means by which the persons questioned are themselves made to furnish proofs which will eventually send them to prison or death. In any event, whatever its outcome, such questioning is often indispensable to crime detection. Its compelling necessity has been judicially recognized as its sufficient justification, even in a

society which, like ours, stands strongly and constitutionally committed to the principle that persons accused of crime cannot be made to convict themselves out of their own mouths.''

Further light on the distinction between the investigatory stage and the accusatory stage has been given in the recent case of *People* v. *Stewart,* 62 Cal.2d 571, 577, 578 [43 Cal.Rptr. 201, 400 P.2d 97]. In *Stewart* the court held that extensive questioning by the police over a period of five days of one held in custody was designed to elicit incriminating statements and hence was a process of interrogations which required constitutional warnings, the absence of which made a confession inadmissible. In so ruling, however, the court took occasion to delineate what it meant by the accusatory stage. ▮ The accusatory stage is reached when two conditions have been met, (1) the investigation is focused on a particular suspect who has been arrested, and (2) the officers have undertaken a process of interrogations whose purpose is to get a confession. The court was careful to point out that the accusatory stage does not begin with the arrest alone. ''We do not agree with the suggestion of some writers that, for purposes of *Escobedo,* the accusatory or critical stage begins with the arrest alone ... Although in most cases the process of interrogations following an arrest will so lend itself, it does not necessarily do so.'' Beyond the point of arrest the police must have entered upon ''a process of interrogations that lends itself to eliciting incriminating statements'' before the proceedings can be said to have reached the accusatory stage. The test for determining when this stage has been reached does not depend upon the actual intent or subjective purpose of the police in undertaking the interrogations, but rather on the objective evidence from which the purpose of the interrogation may be determined.

The court cited with approval *United States* v. *Konigsberg,* 336 F.2d 844, 853, a case in which the dispute over whether a warning had been given was considered immaterial by the court, because at that time the accusatory stage had not been reached. The defendants had been arrested in a garage containing stolen property and on being thereafter questioned at headquarters by federal agents made incriminating statements which were later introduced in evidence. As the case was summarized by the California Supreme Court: ''Among other reasons for not applying *Escobedo,* the court said that the purpose of the interrogation, even though it took place

after the arrest, was not to elicit a confession. The court stated, 'The uncontradicted purpose of the discussion was to give Konigsberg a chance to explain his presence in the garage if he could; to hear Konigsberg's side of the story. . . . If Konigsberg or any of the other people caught in the garage could account for their presence this was their opportunity.' '' (P. 579.)

The court in *Stewart*, 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], listed five factors to be considered in determining whether or not the police were carrying out a process of interrogations: (1) time of interrogation; (2) place of interrogation; (3) length of interrogation; (4) nature of questions; (5) conduct of the police. The court reviewed the police questioning of Stewart in the light of these factors and ruled that the accusatory stage had been reached at the time of his confession on his fifth day in custody.

Instances of legitimate investigatory questioning of suspects under restraint are found in each of the three leading cases which have articulated the right to counsel in the accusatory stage: *Escobedo* v. *Illinois,* 378 U.S. 478, 479, 485 [84 S.Ct. 1758, 12 L.Ed.2d 977]; *People* v. *Dorado,* 62 Cal.2d 338, 343, 347 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Modesto,* 62 Cal.2d 436, 446-447 [42 Cal.Rptr. 417, 398 P.2d 753]. In *Escobedo* the suspect was detained and questioned by the police on the night of the killing and later released. Only the questioning which occurred on his rearrest 10 days later was outlawed by the court as having taken place at a time when the suspect had become the accused. In *Dorado,* the suspect was initially examined by an investigating officer, but only the questioning which started an hour later in the presence of the district attorney was found to be an accusatorial process of interrogations. In *Modesto,* the initial questionings by the police without constitutional warnings were held proper because the purpose of these questionings was primarily to further the investigation and perhaps save life, rather than to build a case against an accused.

In the present case Bakersfield police officers saw a car whose license number was on a list of reported stolen cars and saw Ford at the wheel with the motor running. The immediate duty of the police required them to secure possession of the car and the presence of the driver for further investigation. Under the circumstances the driver was, of course, a suspect. But at the time of his arrest it could not be said he had become an accused nor that the police were

attempting to get him to confess his guilt. We see no reason why the driver should not have been asked by the police for his full explanation. A number of possibilities might account for the car being on a list of stolen cars and yet not subject the driver to prosecution; as for example, the driver had a quarrel with a member of his family who reported a stolen car in a fit of pique; the driver had some dispute with the seller of the car over terms and conditions; the driver had been lent the car by a friend on a drunken spree, who mistakenly reported it as stolen on sobering up; the driver had been employed by the real thief to do an errand; the driver had taken a relative's car without permission, and the relative on learning the identity of the taker declined to prosecute. While the driver of a stolen car is normally a person under suspicion of having violated the criminal law, the suspicion may prove unfounded or be deflected elsewhere in the course of a brief investigation. At this initial stage of the investigation possible innocent explanations of the driver's predicament made it advantageous to all concerned to get his story freely and quickly. If the driver's story checked out, he might have been on his way in short order. Only if his story did not convince the authorities would the accusatory stage have been reached, that is to say, the stage at which a person about to be accused of a crime must be cautioned on his rights.

In this case while Ford was not a free agent once he had been detained by the Bakersfield police and taken to the police station neither was he a person held in custody to answer a particular charge. In reviewing the questioning of Ford at the Bakersfield police station in order to determine whether the police were conducting a process of interrogations designed to elicit a confession, we find the five factors set forth in *People* v. *Stewart,* answerable somewhat as follows:

Place of interrogation—Bakersfield police station,

Time of interrogation—immediately upon arrival at the station,

Length of interrogation—30 to 40 minutes,

Nature of questions—essentially seeking the suspect's explanation, similar to those in the *Konigsberg* case,

Conduct of police—no accusations or questioning on inconsistencies appear to have taken place; no statement was written out and presented to defendant for signature; nothing suggests the conversation was other than voluntary.

"[T]he total situation which envelops the questioning" (*People* v. *Stewart,* p. 579) indicates that the questioning at the Bakersfield police station was designed to find out what had happened and what Ford's explanation was so that the police could dispose of this particular item of pending business by either pressing charges against Ford or releasing him. In the spectrum running from (1) witness, to (2) suspect, to (3) accused, to (4) defendant, Ford was still in the suspect classification (2) and had not yet moved into the stages in which he would become an accused (3) or a defendant (4).

The questioning of Ford at the time of his arrest and at the Bakersfield police station, we hold to be factual questioning of a suspect in furtherance of an investigation and properly admissible in evidence. (*People* v. *Dorado,* 62 Cal.2d 338, 354 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97].)

### Nonreversible Error and Sufficiency of the Evidence

The remaining question is whether the impropriety of admitting in evidence Ford's statements to the Los Angeles police requires a reversal of his conviction.

Ford's statements to the Los Angeles police were in the form of protestations of innocence of the auto theft (of which he was ultimately acquitted), but we assume that in legal effect they were sufficient to amount to a confession of the crime for which he was convicted, driving an automobile without permission with intent to deprive its owner of possession. Ordinarily, the improper receipt in evidence of a confession automatically requires a reversal of the case because its effect is presumed to be highly prejudicial. However, such a result does not logically follow when a later confession merely duplicates and reiterates an earlier confession which has been lawfully obtained. (*People* v. *Parham,* 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]; *People* v. *Garner,* 57 Cal.2d 135, 144 [18 Cal.Rptr. 40, 367 P.2d 680]; *People* v. *Moya,* 53 Cal.2d 819, 822 [3 Cal.Rptr. 360, 350 P.2d 112]; *People* v. *Atchley,* 53 Cal.2d 160, 170-171 [346 P.2d 764].) In such a situation there is no danger that an illegal second confession can somehow taint a legal first confession nor do we face the problem of a defendant who, once having been tricked into letting the cat out of the bag, feels it hopeless to try and stuff it back in. (*United States* v. *Bayer,* 331 U.S. 532, 540 [67 S.Ct. 1394, 91 L.Ed. 1654].)

Accordingly, we do not consider this a case which requires an automatic reversal but rather one in which we must determine whether the improper admission of evidence resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½.) ▮ Not every violation of due process demands a reversal of a judgment, and not every erroneous invasion of constitutional right requires a new trial. (*People* v. *Modesto,* 62 Cal.2d 436, 460-464 [42 Cal.Rptr. 417, 398 P.2d 753], Peters, J., concurring and dissenting; *People* v. *Watson,* 46 Cal.2d 818, 834-837 [299 P.2d 243].)

▮ The key fact with respect to the charge of unlawful driving is Ford's admission that he knew the car was hot. Whether he said this once or five times is of little consequence, because the admission is of such a nature as to be conclusive evidence on the particular charge of which he was convicted. Its repetition on subsequent occasions adds nothing, for there is no shred of evidence that the first admission was the result of inadvertence or misunderstanding or lack of communication or ill health or intoxication. After the first questioning in which Ford admitted he knew the car was hot, further admissions were largely superfluous insofar as the charge of driving without consent was concerned. While it is true that Ford's later statements might have had some prejudicial effect on his defense against the charge of car theft, when he was acquitted of car theft any such effect became inconsequential. Insofar as relevant to the charge for which he was convicted, we are of the opinion that the erroneous admission in evidence of Ford's statements to the Los Angeles police was non-reversible error and did not produce a miscarriage of justice which would make a different result probable on retrial. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

▮ Even if we disregard all statements of the defendant after his arrest, there was sufficient other evidence to sustain his conviction of unlawfully driving an automobile. Defendant was found at the wheel of a stolen car two days after it had been taken. Earlier he had been stopped in another city and at first had said the car belonged to his sister, then to a girl friend, then to a friend of a girl friend. At the time of his arrest when told the car was reported stolen he said nothing.

▮ Possession of recently stolen property, with slight corroboration through statement or conduct tending to show guilt, warrants a conviction for unlawful taking. (*People* v. *Hopkins,* 214 Cal.App.2d 487 [29 Cal.Rptr. 636]; *People* v. *Rhine-*

*hart,* 137 Cal.App.2d 497 [290 P.2d 600].) ▮ "Where recently stolen property is found in the conscious possession of a defendant who, upon being questioned by the police, gives a false explanation regarding his possession or remains silent under circumstances indicating a consciousness of guilt, an inference of guilt is permissible and it is for the jury to determine whether or not the inference should be drawn in the light of all the evidence." (*People* v. *McFarland,* 58 Cal.2d 748, 755 [26 Cal.Rptr. 473, 376 P.2d 449].) ▮ We conclude that the evidence to sustain the defendant's conviction of cartaking was ample.

## Other Contentions

Defendant contends the corpus delicti of the crime was not established independently of his admission. ▮ The corpus delicti of section 10851 requires only that the vehicle be taken or driven by someone without the owner's consent with the intent to temporarily or permanently deprive. (*People* v. *Marion,* 197 Cal.App.2d 835, 841 [18 Cal.Rptr. 219].) ▮ The testimony of Mrs. Pennario satisfied this requirement.

Finally, defendant contends the prosecution did not prove he drove the car in Los Angeles County and therefore the trial court was without jurisdiction. ▮ Venue need not be proved beyond a reasonable doubt but only by a preponderance of evidence which may be direct or circumstantial. (*People* v. *Hill,* 2 Cal.App.2d 141 [37 P.2d 849] ; *People* v. *Bastio,* 55 Cal. App.2d 615, 617 [131 P.2d 614].) ▮ Here the car was taken in Los Angeles County. Two days later defendant was found in a neighboring county at the wheel of the car with the motor running. This would support an inference that defendant had driven the car in Los Angeles. The defendant said he had gotten the car from Mike in Watts. ▮ We take judicial notice that Watts is in Los Angeles County. (Code Civ. Proc., § 1875, subd. 9.)

The judgment is affirmed.

Herndon, J., concurred.

ROTH, P. J.—I dissent.

The record discloses six interrogations of Ford. The first one had at Modesto at 1 a.m. on November 29, 1963. This interrogation is not material to the issues discussed here or in the majority opinion. The second (the arrest interrogation) in

Bakersfield at 11:45 p.m. on the same day. The third (the custody interrogation) 30-40 minutes in length, at the Bakersfield police. When, with respect to the arrest interrogation, this took place cannot be ascertained from the record. The fourth, at Bakersfield on December 3, when the Los Angeles police officer arrived to return Ford to Los Angeles. The fifth on December 3 in the automobile returning Ford to Los Angeles, and the sixth on December 5 in the Los Angeles police station. The last interrogation was tape-recorded.

Interrogations 4, 5 and 6 are conceded by the majority to be within *Dorado*. The majority couples the arrest and custody interrogations and says in respect thereof:

"The questioning of Ford at the time of his arrest and at the Bakersfield police station, we hold to be factual questioning of a suspect in furtherance of an investigation and properly admissible in evidence. *(People v. Dorado,* 62 Cal.2d 338, 354 [42 Cal.Rptr. 169, 398 P.2d 361]; *People v. Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97].)" I agree that the arrest interrogation was investigatory. I believe the custody interrogation was accusatory.

The majority hold that the impropriety of admitting the interrogations with the Los Angeles police which the majority concedes to be a confession although within *Dorado* does not require a reversal because it: ". . . merely duplicates and reiterates an earlier confession which has been lawfully obtained. *(People v. Parham;* 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]; . . .) . . . there is no danger that an illegal second confession can somehow taint a legal first confession. . . ."

I do not agree that the "later questioning" was a duplicate of the first, and I believe that even if it was, a reversal is required.

Assuming *arguendo,* that the arrest and custody interrogations linked together by the majority were during an investigaory stage, and that it was "an earlier confession . . . lawfully obtained . . ." and that the later tainted confession merely "duplicates and reiterates" the earlier lawful confession, such assumptions do not rule out *Dorado. Dorado* clearly announces at pp. 356-357: "The improper introduction of the confession which has been obtained in violation of the constitutional right to counsel transgresses the protection of due process no less than the illegal introduction of a confession which has been coerced. In either case courts cannot inquire into the prejudicial nature of the introduction of an illegally

obtained confession for the reasons stated in *People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]; 'Almost invariably . . . a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction. [Citation omitted.] . . .

"Summarizing the principal issue on the confession, we must decide this case in conformity with the decisions of the Supreme Court of the United States. That court having declared the content of a constitutional right, it is our function to enforce it in situations wherever it logically applies. To do otherwise would, in effect, be to distort the United States Constitution itself."

The majority concede that the "later questioning by the Los Angeles police" was a confession. The issue here is not whether harmless error is committed when a statement or an admission is admitted of ". . . something less than . . . an essential element of the crime or the fact necessary to establish . . . guilt. . . ." (*People* v. *Dorado*, 62 Cal.2d 338, 356 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Finn*, 232 Cal. App.2d 422, 428 [42 Cal.Rptr. 704]; *People* v. *Peckham*, 232 Cal.App.2d 163 [42 Cal.Rptr. 673].)

I am mindful of *People* v. *Parham*, 60 Cal.2d 378, in which case a defendant was choked to extract evidence from his mouth and the court said at pp. 385-386 [33 Cal.Rptr. 497, 384 P.2d 1001]:

"Unlike involuntary confessions, other illegally obtained evidence may be, as in this case, only a relatively insignificant part of the total evidence and have no effect on the outcome of the trial. . . . Unless we were to take the unprecedented step of holding that the state must be penalized for violating a defendant's constitutional rights in securing evidence by conferring an immunity upon him . . ., we must consider . . . the exclusionary rule not as a penalty but as derived from the principle that the state must not profit from its own wrong. . . . The state does not so profit when erroneously admitted evidence does not affect the result of the trial. . . ."

In the same case and immediately preceding the above quoted statement the court says at page 385:

"Defendant . . . invokes the rule that the admission of an involuntary confession in evidence requires reversal regardless of other evidence of guilt presented to the jury. (*Lynumn* v. *Illinois*, 372 U.S. 528 [83 S.Ct. 917, 922, 9 L.Ed.2d 922]; *Rogers* v. *Richmond*, 365 U.S. 534, 540-541 [81 S.Ct. 735,

5 L.Ed.2d 760, 766-767]; *Payne* v. *Arkansas,* 356 U.S. 560, 567-568 [78 S.Ct. 844, 2 L.Ed.2d 975, 980-981]; *Stroble* v. *State of California,* 343 U.S. 181, 190 [72 S.Ct. 599, 96 L.Ed. 872, 880-881].) *Almost invariably, however, a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction.* (See *Payne* v. *Arkansas,* 356 U.S. 560, 568 [78 S.Ct. 844, 2 L.Ed.2d 975, 981]; Allen, *Federalism and the Fourth Amendment*: *A Requiem for Wolf,* 1961 Sup. Ct.Rev. 1, 45; cf. *Hamilton* v. *Alabama,* 368 U.S. 52, 55 [82 S.Ct. 157, 7 L.Ed.2d 114, 116-117].) These considerations justify treating involuntary confessions as a class by themselves and refusing to inquire whether in rare cases their admission in evidence had no bearing on the result.'' (Italics added.)

As I read *Dorado,* improper introduction of an unlawful confession leaves no room to determine whether or not it is harmless error. *Dorado* adopts the rule announced by *Parham* and emphasized in the excerpt above.

The foregoing construction of *Dorado* appears to be fortified by the opinion in *Stewart, supra,* 62 Cal.2d 571, 581-582, where the court says: ''Because defendant, however, confessed only to the robbery and murder of Miss Mitchell, we must determine if the erroneous admission of his confession constituted prejudicial error as to those other robberies for which he was convicted but as to which he did not confess. (See *People* v. *Dorado, supra, ante,* pp. 338, 356.) A full examination of the record indicates that the error requires the reversal of the judgment on these counts since 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)''

I am of the opinion too, that the ''later questioning by the Los Angeles Police'' is not a duplicate of the arrest and the custody interrogations. Although there is reiteration of some statements, there are differences which are hereafter pointed out.

William P. McMonagle who identified himself as ''what we call an investigating officer'' attached to the Wilshire District Division of the Los Angeles police, testified that at approximately 1 p.m. at the City of Bakersfield on December 3, he talked to Ford in the presence of his partner, Sergeant Dennis, and a detective from the Bakersfield Police Depart-

ment. The conversation was had with Ford at the Ace Garage in Bakersfield where the stolen car was impounded. Ford pointed out the car and stated he had been driving it when he was arrested, and that he had known the car had been stolen.

McMonagle further testified that en route from the Ace Garage to the Wilshire Station in Los Angeles, Ford said: "[H]e had known the car was stolen and . . . *'He would take the rap for the stolen car, but he wouldn't take the rap for the burglary'. . . .*" (Italics added.) Later, he stated "he had known the car had been stolen but *that he didn't steal it. . . .* [T]hat he had gotten the car from a guy named Mike in Watts," on, he thought it was Wednesday; . . . later . . . *he thought the plates on the car had been switched so that it had cold plates on it before he got it. . . .* [*A*]*lso, that he had been to Oakland twice in the car; that he had been to Bakersfield about three times, and he stated he wanted to get the car back to Los Angeles,* he was on his way back, *so that no one would know the car had been out of town. . . . He also stated he had been through Bakersfield, the first time he had been loaded, and if we had caught him then it would have been too bad. . . .* [Italics added.] Well, we talked, . . ., at least an hour . . . coming to Los Angeles, . . . when we got to Wilshire Station we had another conversation. . . . I asked him where he knew Mike from, and he said, . . . *'I met him in a bar. . . .'* . . . *I asked him what Mike looked like, and he said, 'Well, he looks about like me.'* . . . *'*[*A*]*bout my height.'* . . . *He stated he couldn't help us find him, that it was a matter of honor, more or less, with him. . . . He said this Mike was a con, and all the people that hung around down where he got the car were cons, and he didn't want to be known amongst them as a 'snitch.'*" (Italics added.)

None of the italicized portions of the "later questioning" appear in the arrest or custody interrogations. In my opinion the confessions are not duplicates. I suspect that the prosecutor also properly believed that the additional facts obtained in the "later questioning" would have considerable impact on any jury.

It is my opinion too that the accusatory stage had been reached upon the conclusion of the arrest interrogation and before the custody interrogation had begun at the Bakersfield police station.

When investigation ceases and accusation begins is often a sensitive question.

It is clear that assuming arrest and failure to advise, there must be focus on a defendant and thereafter a purpose to elicit

incriminating statements and/or a confession. (*Dorado, supra,* p. 354.)

Specifically, the record shows that after the Modesto interrogation, immaterial here, Ford in the late evening of the same date, to wit: November 27 at 11:40 p.m., was observed by Officers Burum and Patterson sitting in an automobile, double-parked. Burum was asked what attracted his attention to the automobile or to Ford. He gave the arrest interrogation as follows:

"Well, the fact it was double parked and that someone got out of the car and that the car was unfamiliar to me as being in that particular area. . . .

" . . . . . . . . . .

"I checked the license number of the vehicle against the Los Angeles Police Department stolen sheet that is mailed to us every day and found that the license number of the vehicle was listed on the sheet.

" . . . . . . . . . .

"Q. And where within the car was the Defendant seated? A. Behind the steering whele.

" . . . . . . . . . .

"Q. After checking, finding the numbers of the car were on that particular list, what did you do? A. I placed the subject under arrest and checked with our communications center, which keeps a master list of stolen cars, which is published by Sacramento, by teletype.

" . . . . . . . . . .

"Q. . . . [W]hen you first arrested him. Where was the first conversation? Was that out in the field or in the station? A. Out in the field.

"Q. All right. At that location tell us what was said about the car. A. He was asked who owned the vehicle.

"Q. What did the Defendant say to that? A. He stated that it was registered to a Mary Pennario, but he did not know her address.

"Q. Did you ask him how he happened to be in possession of the car? A. Yes, sir.

"Q. What did he say about that?

" . . . . . . . . . .

"A. He didn't say much of anything at that time."

The foregoing interrogation concededly investigatory was held in the presence of Officer Bill Patterson on the street in Bakersfield when appellant was arrested.

Appellant was then taken to the police station where the

custody interrogation was had between Ford and Officer Burum in the presence of Officer Archie Sherman.

There is nothing in the record, as already pointed out, to indicate when the custody interrogation started. It could be five minutes—it could have been five hours after the arrest interrogation. It is clear from the record that it lasted 30-40 minutes and was had in the presence of a different second officer. It is also clear that the narration of the testimony at the trial could not have occupied more than approximately two minutes of the court's time. The substantially verbatim interrogation as testified to at the trial, follows:

"Q. Were the statements made by the defendant there at the Police Department concerning the car freely and voluntarily made? A. Yes.

"Q. Was any force or coercion used on him, or anything like that? A. No.

"Q. All right. What did he say about the car in the Police Department? A. He stated he had borrowed it from a friend by the name of *Mike in Watts,* and *that he knew*—he told me that *he knew it was stolen*—that *he knew it was hot,* as he stated it, but, *he said, he did not take it initially.* [Emphasis is added to indicate admissions not made in the arrest interrogation.]

"Q. He told you he knew it was hot? A. Yes, sir.

"    .     .     .     .     .     .     .     .     .     .     .     .

"Q. For our record, as a police officer what does the word 'hot' mean? A. It means stolen, or not belonging to the person that has it.

"Q. Now, did you ever ask him why he gave you the first story about having borrowed it from Mary Pennario? A. Not when we first talked to him out in the field, no.

"Q. Yes, but later on when he told you he had gotten it from a friend in Watts, knew it was hot, you didn't go back, ask why he told you about Mary Pennario . . . ? A. No, sir."

The foregoing statements were not volunteered. Before Officer Burum gave the testimony above excerpted, he testified referring to Officer Sherman and himself: "Yes, sir; in the police station we talked to him." He then reiterated said statement as follows:

"Q. . . . Now, later did you discuss this car with the Defendant? A. Yes, sir, we did. Q. Now, this was in the station, I take it? A. In the Police Department, yes. Q. All right, who was present at that conversation in the Police Department? A. Officer Archie Sherman."

In my opinion the factors listed by *Stewart, supra,* as criteria to help decide whether an interrogation is investigatory or accusatory, should be annotated as follows:

1. Ford was under arrest upon ample probable cause.

2. Interrogation was at the Bakersfield police station in the presence of an arresting officer and a second officer who was not present at the arrest interrogation.

3. The time elapsing between the arrest interrogation and the custody interrogation is not disclosed by the record.

4. The nature of the questions asked does not appear in any respect from the record. Whether such questions were or were not in the nature of *Konigsberg,* 336 F.2d 844, is, in my opinion, a deduction not warranted. In *Konigsberg* too, the facts were different (there were many suspects) and the defendant in that case was advised of his constitutional rights.

5. The record is completely silent as to the nature of the custody interrogation, other than it took place in the Bakersfield police station. What accusations were made or what questions were propounded, does not appear. It does appear that although the statements made by Ford were voluntary and not coerced, that they were not volunteered. The only evidence on that subject is that of officer Burum who testified: "Yes, sir. In the police station we talked to him."

When Ford was arrested, focus was definitely on Ford.

Ford's inability at the time of the arrest interrogation to give any address for Mary Pennario, street, neighborhood, city or state, when behind the wheel of a car the officers knew was stolen, and the fact that he didn't say anything when told the car was stolen, was ample, not only for a showing of probable cause, but uncontradicted and unexplained, for a conviction. These facts standing alone make out a complete case of a violation of section 10851 of the Vehicle Code. Thus, in *People* v. *Citrino,* 46 Cal.2d 284, the court says at page 289 [294 P.2d 32]:

Defendant's explanation that Cotelli gave him the property was not contradicted by any witness, but in view of defendant's own use of that name and the fact that he did not know where Cotelli was at the time of the trial, the jury could reasonably conclude that Cotelli and his gift were both fictitious."

In *Stewart,* at pp. 577-578, the court says: "An arrest fulfills the first requirement that the investigation has begun to focus on a particular suspect. The Penal Code itself con-

ditions the arrest upon the presence of reasonable ground for the belief that the individual committed the offense; section 813 predicates the issuance of a warrant upon 'reasonable ground to believe that the defendant has committed' the offense; section 836 requires that the arrest must rest upon the officer's reasonable cause for believing the person committed the offense.

" 'Probable cause for an arrest,' we have said, 'is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. . . . Probable cause may exist even though there may be some room for doubt. . . . The test in such case is not whether the evidence upon which the officer made the arrest is sufficient to convict but only whether the prisoner should stand trial.' (*People* v. *Fischer* (1957) 49 Cal.2d 442, 446 [317 P.2d 967]; see generally, Witkin, Cal. Criminal Procedure (1963) pp. 102-104; Fricke, Cal. Criminal Procedure (6th ed. 1962) pp. 19-20.) "

In *People* v. *Hopkins,* 214 Cal.App.2d 487 [29 Cal.Rptr. 636], the court held that mere possession of recently stolen property, with slight corroboration through statement or conduct tending to show guilt, warrants a conviction of unlawful taking. See also, *People* v. *Rhinehart,* 137 Cal.App.2d 497 [290 P.2d 600]; *People* v. *Holland,* 82 Cal.App.2d 310 [186 P.2d 58]; *People* v. *Citrino,* 46 Cal.2d 284 [294 P.2d 32]; *People* v. *Valdez,* 14 Cal.App.2d 580 [58 P.2d 656]; *People* v. *Ragone,* 84 Cal.App.2d 476, 481 [191 P.2d 126]; to the same effect.

The foregoing appears to fortify the majority conclusion that the investigatory interrogation standing alone could have convicted Ford. The vice of this conclusion, however, is pointed out by the language in *Parham, supra,* heretofore quoted: ". . . a confession will constitute persuasive evidence of guilt, and it is therefore usually extremely difficult to determine what part it played in securing the conviction." (P. 385.)

The majority hold that arrest alone is not necessarily the line of demarcation for the accusatory stage. With this I agree. The accusatory stage might very well be reached before arrest and in some cases after arrest. It would seem, however, in view of the fact that an arrest cannot be made without probable cause, that it would be seldom reached after an arrest. Thus, in *People* v. *Garner,* 57 Cal.2d 135 [18 Cal.Rptr. 40, 367 P.2d 680], Justice Traynor in a concurring opinion

at page 164 suggests that the rule could be frustrated by delaying an actual arrest.

Lawful arrest appears to be, to say the least, a substantial ingredient in a test of focus. If there are other guidelines, they are vague.

In *Dorado,* at page 347, the court says: "The weight of the circumstantial evidence recited above and available to the officers *at the point of interrogation* provided reasonable grounds for focusing upon defendant as the particular suspect." (Italics added.)

This test appears to state the ingredients of reasonable or probable cause for arrest and would probably apply if no arrest is made.

In addition to arrest, there must be a purpose to obtain a confession or elicit incriminating statements. The test to determine the purpose is fixed as objective and not subjective. In other respects it is vague. Thus, in *Stewart, supra,* the court says at page 579:

"The test which we have described does not propose a determination of the actual intent or subjective purpose of the police in undertaking the interrogations but a determination based upon the objective evidence. Whatever may be the subjective intent of the interrogators, we must, in order to determine if the police are carrying out 'a process of interrogations that lends itself to eliciting incriminating statements' (*Escobedo* v. *Illinois, supra,* at p. 491), analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.

"As some writers have suggested, 'An objective test is ... likely for the new American rule, for it is noteworthy that the question of "purpose to elicit a confession" may be more readily determined from the objective evidence—such as the nature of the questions and accusations put to defendant and the length of the interrogation—than the question whether the police had decided to charge the defendant.' (Enker and Elsen, *Counsel for the Suspect: Massiah* v. *United States and Escobedo* v. *Illinois* (1964) 49 Minn.L.Rev. 47, 71.)"

On the record before this court it appears to me that the majority assume that the custody interrogation was investigatory because it took place "shortly" after the arrest. And further, they assume that even though the objective evidence

shows that focus was properly on Ford, that since the record is silent on what specific questions were put to Ford, that the Bakersfield police were seeking only information which would adequately explain Ford's presence in the stolen car, so they could set him free. As already pointed out, there is no evidence that supports the statement that the custody interrogation took place "shortly" after the arrest. And further, the second assumption was specifically rejected by this court, speaking through my brother Herndon in *People* v. *North*, 233 Cal.App.2d 884 [44 Cal.Rptr. 123], where we said: "Since in 'most cases' the interrogation will ... lend itself [to eliciting incriminating statements] in the absence of any contrary showing ... in the record we cannot presume that this is one of the 'rare' or 'unusual' cases in which it did not so lend itself."

I would reverse the judgment.

A petition for a rehearing was denied June 9, 1965, and appellant's petition for a hearing by the Supreme Court was denied July 14, 1965. Peters, J., was of the opinion that the petition should be granted.