[Crim. No. 12860.   Second Dist., Div. One.   July 28, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. SALVADOR SANTOS GOSMAN, Defendant and Appellant.

Joseph Amato, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Elizabeth Miller and Mark W. Jordan, Deputy Attorneys General, for Plaintiff and Respondent.

WOOD, P. J.—In a jury trial, defendant was found guilty of murder of the second degree. He appeals from the judgment and from the order denying his motion for a new trial.

Appellant contends that the court erred (1) in refusing to give requested instructions on manslaughter, and (2) in receiving evidence of statements made by defendant while he was in the custody of the police.

Jo Ann Pickrell was murdered by strangulation on December 21, 1965, between 1 a.m. and 7 a.m. Her nude body was found in a vacant lot in the 1000 block of North Douglas Street in Los Angeles. There were "abrasions or scrape marks" on the body which indicated that the body had been dragged over a hard surface, and there were "drag marks" from the body to an alley. In the alley there were tire prints which, according to expert testimony, were the same design as the tire prints on a 1965 Lincoln Continental which had been stolen by the defendant about 6 p.m. on December 20, 1965.

Defendant and Jo Ann, who was a prostitute, came to Los Angeles on October 25, 1965, and lived together at various apartments thereafter. They went to bars at night in Los Angeles in order that Jo Ann might meet men and engage in acts of prostitution. Jo Ann earned between $20 and $50 a night, and she gave the money to defendant so that he would not have to work.

In December 1965 defendant met Ada Alegria. He went out with her several times and asked her to marry him. She said that she would marry him in March (1966), but he asked her to marry sooner, and suggested that they marry on January 3 (1966) which was his birthday. Ada did not know that defendant was living with ''another woman.''

About 6 p.m. on December 20, 1965, defendant stole a purple 1965 Lincoln Continental automobile from a parking lot in Los Angeles. He replaced the California license plates with a Utah license plate, and then went to the apartment where he lived with Jo Ann. About 9 p.m. he and Jo Ann went in the Continental to the Embassy Room (a bar), where he left Jo Ann. He then drove to the Copa De Oro Bar where he had a beer. He left there about 9:30 p.m. and went to Ada's house, and he and Ada returned to the Copa De Oro Bar. About 10:30 p.m. he and Ada went in the Continental to her house.

About 15 minutes after defendant had left Jo Ann at the Embassy Room, she left there with a man. About 10:30 p.m. Jo Ann arrived at the Cordova Bar and stayed there until 1 a.m., drinking with a Mexican man.

Prior to 1 a.m. defendant came into the Cordova Bar and tried to get Jo Ann to leave the bar because he did not like her keeping company with a Mexican and thought that she was drinking too much. Defendant and Jo Ann left the Cordova Bar at 1 a.m. At 7 a.m. while Mr. Chevarria was walking on the sidewalk, in the 1000 block of North Douglas Street, he saw Jo Ann's body in the vacant lot.

Margaret Petrelli (called as a witness by the defendant) testified that she lives at 1008 North Douglas Street, which is across the street from the vacant lot where Jo Ann's body was found; between 1 a.m. and 2 a.m. on December 21, she saw ''a large car'' parked in the alley next to the lot; the car was parked there for awhile and she ''watched it because it was parked with the lights on and it wasn't moving''; she could not determine what ''make'' the car was; and she did not see anyone leave the car.

Carlos Delgado (called by defendant) testified that he is a composer; he met defendant at the Copa De Oro Bar about 11 p.m. on December 20; they had a few drinks; they left the bar after 1 a.m., when defendant took him to his (witness') home; and they arrived there about twenty minutes later.

Defendant did not testify.

Appellant contends that the court erred in refusing to give requested instructions on manslaughter.

■ "Where the evidence in a murder case is such as would warrant a conviction for manslaughter, it is error to refuse to instruct upon this issue [citation], but if the evidence does not warrant such a conviction, instructions thereon may be refused." (*People* v. *Bufarale,* 193 Cal.App.2d 551, 560 [14 Cal.Rptr. 381].)

■■ The evidence presented by defendant in the present case tended to show a defense of alibi—that he was with Delgado when the murder was committed. He did not present any evidence that the killing had been without malice or that it resulted from a sudden quarrel or from heat of passion. (Pen. Code, § 192.) There was evidence that the victim had been strangled and that her nude body had been dragged into the vacant lot; that defendant, who had lived with the victim, was anxious to marry another woman; and that defendant on the evening of the killing had stolen the automobile from which the victim's body had been dragged into the lot. The only evidence in any manner relating to a quarrel or to heat of passion was testimony by one of the prosecution's witnesses (a landlord who had rented an apartment to defendant and Jo Ann in November 1965) that he had occasionally heard loud noises, which sounded like argument, coming from the apartment; and testimony by another of the prosecution's witnesses (bartender at Cordova Bar) that when defendant came to the bar about 1 a.m. he tried to get Jo Ann to leave and tried to pick her up. Such evidence would not warrant conviction for manslaughter. The evidence is sufficient to support the verdict that defendant was guilty of murder in the second degree. (See *People* v. *Bender,* 27 Cal.2d 164, 178 [163 P.2d 8].) The court did not err in refusing to give instructions on manslaughter.

Appellant further contends that the court erred in receiving evidence of statements made by defendant while he was in custody of the police.

Defendant was arrested by a federal officer on December 21, 1965, on "a charge unrelated to" the murder. While he was

in custody on that charge, and during the period between December 27, 1965, and January 4, 1966, Police Officer Alexander, who was investigating the murder of Jo Ann, had several conversations with defendant. According to the officer, "the investigation at this point was still a general inquiry into an unsolved crime"; defendant appeared to be trying to give him leads to find the "killer"; he was affording defendant a chance to explain where he had been on the night of the killing; defendant gave him the names of persons and places which he (officer) "checked out"; defendant gave him the name of defendant's attorney on December 28, and said that he would take a lie-detector test if his attorney agreed; he (officer) telephoned the attorney, who said it was all right for defendant to take the lie-detector test; and defendant did not become a suspect until January 5, 1965, because he had a "story" which the officer "checked out." During the conversations (between December 27 and January 4) defendant, who was not advised of his constitutional rights, made statements in substance as follows: Defendant and Jo Ann came to Los Angeles in October 1965. They lived at 919 South Albany, and then moved to 723 South Columbia, and then to 1336 Shatto Street. Jo Ann was a prostitute. She worked in the downtown bars, including the Embassy Bar, the Cordova Bar, Lombardi's, and the Cap and Quill. She made good money, approximately $20 to $50 a night, and gave the money to him because she did not want him to work. On the night of December 20, they took a taxicab downtown and he left her off at the Embassy Bar about 9 p.m. He went to the Copa De Oro Bar, left there, and returned there by taxicab about 10:30 p.m., when a friend drove him to the Cordova Bar. He went into the Cordova Bar and Jo Ann was sitting with a Mexican. She was drunk, and he did not approve of her associating with Latins. He stayed there awhile and then took her coat and purse, and he took her by the arm and made her leave. She asked to stay out a little longer, and he took her to the Embassy Bar. He left her there, and took a taxicab to the Copa De Oro Bar where he stayed for about an hour. He went home at 1 a.m., where he watched an old movie on television until the early morning hours of December 21.

Officer Alexander had a further conversation with defendant on January 5, 1965. Prior to that conversation, defendant was advised that he had a right to remain silent, a right to have an attorney present, and that anything he said might be used against him in a subsequent criminal proceeding. De-

fendant then made statements wherein he admitted that he had stolen the Lincoln Continental and what he had previously said about being in taxicabs on December 20 was untrue. Defendant also made a written statement which was similar to his previous statements with additions in substance as follows: He drove the Continental that night. He picked up his girl friend, Ada Alegria, at the Copa De Oro Bar and took her home about 11 p.m.; after he took Jo Ann from the Cordova Bar to the Embassy Bar, he went to the Copa De Oro Bar about midnight; while there, he was introduced to "some guy who is a composer"; the composer took him to his (composer's) house; they drove "north on Broadway for a long ways"; he left the composer's house about 2 a.m. and went home; he parked the Continental a few blocks from the house, and when he got home he watched television until 3 or 4 a.m.

■ The statements made by the defendant prior to January 5 were exculpatory and were made while the investigation was a general inquiry into an unsolved crime and while defendant was being afforded an opportunity to explain his activities during the evening of the murder. (See · *United States* v. *Konigsberg* (3d Cir. 1964) 336 F.2d 844, 853; *People* v. *Cotter,* 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862]; *People* v. *Lewis,* 244 Cal.App.2d 325, 330 [53 Cal.Rptr. 108]; *People* v. *Washington,* 237 Cal.App.2d 59, 63-64 [46 Cal.Rptr. 545]; *People* v. *Ford,* 234 Cal.App.2d 480, 491-494 [44 Cal.Rptr. 556].) The court did not err in receiving evidence of those statements.

■ The statements made by defendant on January 5 were made after defendant became a suspect and after he had been advised that he had a right to remain silent, a right to have an attorney present, and that anything he said might be used against him in subsequent criminal proceedings. Respondent asserts that such advice was sufficient under the rules in *Escobedo* v. *Illinois* (378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]), and that the rules in *Miranda* v. *Arizona* (384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) are not applicable herein because the trial commenced on June 8, 1966, prior to the date (June 13, 1966) of the decision in *Miranda.* (Citing *People* v. *Rollins,* 65 Cal.2d 681 [56 Cal. Rptr. 293, 423 P.2d 221].) Since the trial began on June 8, 1966, which was before the decision in *Miranda,* the rules in *Miranda* are not applicable herein.

In any event, it was unnecessary to advise defendant that if

he was indigent an attorney would be appointed, because he was already represented by counsel when the conversation (of January 5) occurred; and the record does not show that defendant indicated in any manner during the conversation that he wanted to remain silent or that he wanted his attorney present. (The attorney had consented previously to a lie-detector test of defendant, and was not present at that test.) The court did not err in receiving evidence of the statements made by defendant on January 5.

The appeal from the order denying the motion for a new trial is dismissed. The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied August 16, 1967, and appellant's petition for a hearing by the Supreme Court was denied September 21, 1967.