[Crim. No. 3664. Third District. Feb. 18, 1965.]

In re MALCOLM R. SCHLETTE on Habeas Corpus.

Malcolm R. Schlette, in pro. per., and Werner K. Zimmer, under appointment by the District Court of Appeal, for Petitioner.

Thomas C. Lynch, Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Respondent.

FRIEDMAN, J.—In 1955 petitioner Schlette was indicted on two counts of arson, the first alleged to have been committed on September 9, 1954, the second on February 23, 1955. Both alleged acts involved fires at a tavern owned by petitioner and his wife. The jury returned a verdict of guilty on the first count but was unable to agree on the second. The second count was dismissed and on June 20, 1955, judgment of imprisonment was imposed on the first count. Petitioner's conviction was affirmed on appeal. (*People* v. *Schlette,* 139 Cal.App.2d 165 [293 P.2d 79].)

Petitioner has now filed an application for habeas corpus, seeking discharge from imprisonment and alleging a multiplicity of infirmities characterizing the process of conviction. On September 22, 1964, we issued an order to show cause, limited to the single issue of "receipt in evidence over objection of a confession in possible violation of the rule enunciated" in *People* v. *Dorado* (see *(Cal.) 40 Cal.Rptr. 264, 394 P.2d 952) ; *People* v. *Anderson* (see †(Cal.) 40 Cal.Rptr. 257,

---

*A rehearing was granted on September 24, 1964. The final opinion is reported in 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

†A rehearing was granted on September 24, 1964.

394 P.2d 945) ; and *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]. Following the order to show cause we appointed counsel to represent petitioner.

The holding of *Escobedo* v. *Illinois, supra,* is epitomized by this excerpt from the majority opinion: "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright,* 372 U.S. at p. 342 [83 S.Ct. 792, 9 L.Ed.2d at p. 804, 93 A.L.R.2d 733], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (12 L.Ed.2d at p. 986.)

The decision of the California Supreme Court in *People* v. *Dorado,* as filed on August 31, 1964, and published in (Cal.) 40 Cal.Rptr. 264, 394 P.2d 952, was set aside by an order for rehearing. The decision on rehearing was filed January 29, 1965 (62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]). As summarized in the majority opinion, the *Dorado* case now holds: "We conclude, then, that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (62 Cal.2d at pp. 353-354.)

The California Supreme Court's original decision in *People* v. *Anderson,* filed on the same day as the original *Dorado* decision and published in (Cal.) 40 Cal.Rptr. 257, 394 P.2d 945, was also set aside by grant of a rehearing. At the time of this writing, the decision in *Anderson* has not yet been filed. The legal problem closely parallels that of the *Escobedo* and *Dorado* cases. The question on which we issued the order to

show cause finds an ample pivot in the *Escobedo* and *Dorado* decisions, regardless of any subordinate questions left unanswered by the grant of rehearing in *Anderson*.

The trial record in *People* v. *Schlette* is before us. (See rule 60, California Rules of Court.) William Christensen, a deputy sheriff, went to the tavern on the night of the first fire. There was a burned area on the exterior of the building. He smelled gasoline and in a nearby garage of the premises he found a half-empty gasoline container. The cap was loose and the top of the container was wet with gasoline. Christensen entered the tavern and asked petitioner to remove one of his felt slippers. The sole was damp and smelled of gasoline. There was a faint odor of gasoline on petitioner's hand. Asked for an explanation, petitioner said: "I haven't anything to say. See my attorney, [name of attorney]."

Christensen placed petitioner under arrest and they entered a sheriff's automobile. In the course of the trip petitioner spoke bitterly of his wife, indicating that he suspected her of an affair with an employee of the tavern. Christensen suggested that petitioner "make a clean breast of it." Petitioner said: "I have nothing to say on that."

An arson charge was filed after the first fire but was dismissed at the request of petitioner's wife. As the result of marital discord there was a property settlement agreement through which petitioner's wife received the tavern. In the early morning hours of February 23, 1955, a second fire occurred which destroyed the tavern and a nearby cabin. Christensen and another officer talked to Schlette. Although questioned, he neither admitted nor denied setting the fire.

Further investigation took place and petitioner was arrested on the evening of March 9, 1955. He was interrogated by officers in the sheriff's office at the county courthouse. An investigator for the Board of Fire Underwriters was present. Petitioner's son, Jimmy, had been taken into custody by juvenile officials in connection with a difficulty unrelated to the fires. Petitioner offered to say that he had set the fires if his son were released. He also offered to say "he had did it" if he were sent to Mendocino State Hospital (an institution for the mentally ill) rather than San Quentin State Prison. Both offers were rejected by the officers. During the conversations he was offered opportunities "to call it off, or to contact his attorney." He stated he did not want an attorney. At his request he was taken to a pay telephone in the courthouse corridor in order to speak with his mother. This conversation

occurred between 2:30 and 3 a.m. During the course of the conversation petitioner's mother asked to and did speak to the investigator. Officers stood nearby and heard parts of petitioner's statements to his mother. Two of his listeners heard him utter words to the following effect: "You are too late, Mother; you are always too late. You let me down when I needed you most. What is it to be now?... I am going to make a confession. I am going to tell the truth. I only want to know when—will you keep Jimmy when he is released?... You know I set the first fire, and...."

At 3:35 a.m., after the conversation with his mother, petitioner made a recorded statement in which he admitted starting both fires with gasoline and matches. Following his confession he was asked if he cared to make any further statement. He said: "Yes, I make this statement under the provision I will, instead of being sent to San Quentin, go to the Mendocino State Hospital." The officers told him that only the court could decide where he was to go; that they, the officers, had no authority to make that decision. A tape recording of the confession was played to the jury at his trial.

Petitioner took the witness stand in his own defense. He denied setting the fires. He stated that he had made a false confession in return for an agreement that he be sent to the state hospital and his son Jimmy released from custody. He testified that after the first fire he told Deputy Sheriff Christensen: "I had nothing to say because it was my attorney's instructions." He testified that his attorney had told him to say absolutely nothing.

The quoted excerpt from *Escobedo* v. *Illinois, supra,* inferentially dispenses with a police warning of the right to remain silent when the defendant is already aware of that right. Implicit also is the notion that the right to counsel may be waived by one who knows what he is doing. At footnote 14 (12 L.Ed.2d at p. 986) the majority in *Escobedo* expresses what is already implicit: "The accused may, of course, intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pretrial stage or at the trial. See *Johnson* v. *Zerbst*, 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357]."

Like *Escobedo,* the *Dorado* decision recognizes that the police warning is a superfluity when the suspect already knows his rights. It permits evidentiary use of the incriminating statement where there is a knowing waiver of the right to remain silent and of the right to counsel. Thus the majority opinion

states: "In the absence of evidence that defendant already knew that he had a right to counsel during interrogation, the failure of the officers to inform him of that right precludes a finding that he knowingly waived it. . . . Such waiver presupposes knowledge of the right to remain silent; in the absence of evidence of such knowledge, the waiver requires a warning to the accused of that right." (*People* v. *Dorado, supra*, 62 Cal.2d at p. 352; see also, page 349, fn. 5.)

Schlette's confession was not a product of ignorance of his right to silence or of denial of his right to counsel. The evidence, including his own testimony, demonstrates that before and during the interrogation in the sheriff's office during the night of March 9 he was fully aware of these rights. Their expression in the form of a police warning was thus superfluous. Far from demanding an attorney, Schlette said he didn't want one. He knowingly waived his right to silence and his right to counsel. (Cf. *People* v. *Sigal*, 221 Cal.App.2d 684, 702-703 [34 Cal.Rptr. 767].)

In determining whether a waiver is "intelligent" as well as "knowing," the circumstances of the interrogation and the suspect's capacity to understand the consequences of his actions are factors. (Cf., *In re Johnson*, 62 Cal.2d 325 [42 Cal.Rptr. 169, 398 P.2d 361], filed Jan. 28, 1965.)

Schlette's interrogation was a fencing match, not a third degree grilling. The immediate impetus for his confession was not police questioning but his telephone conversation with his mother. Earlier, he had attempted to barter a confession in return for promises as to his own disposition and that of his son. Although these offers were rejected, he made an attempt retroactively to characterize his confession as a barter arrangement. These efforts demonstrate a high degree of awareness and self-command. The conversations in the sheriff's office and Schlette's own trial testimony supply evidence of intellectual capacity more than adequate for comprehension of his own predicament and of the consequences of his statements. His subsequent history corroborates this estimate of his intelligence.[1] We hold that his waiver was both knowing and

[1]During his imprisonment, according to the Attorney General's return, petitioner has maintained a heavy barrage of writ applications in the federal and state courts, all filed in propria persona. He has twice sought certiorari in the federal Supreme Court after rebuff in the lower federal courts. (See *Schlette* v. *Heinze*, 358 U.S. 921 [79 S.Ct. 296, 3 L.Ed.2d 241]; *Schlette* v. *California*, 284 F.2d 827, cert. den. 366 U.S 940 [81 S.Ct. 1664, 6 L.Ed.2d 852].) He has filed 10 original petitions for habeas corpus with the United States Supreme Court. One has not been acted upon and nine have been denied. His in propria persona peti-

intelligent. His confession and the circumstances under which it was given amply satisfy the admissibility standards pronounced in *Escobedo* v. *Illinois* and *People* v. *Dorado*.

█ So far as the California courts are concerned, the *Escobedo-Dorado* doctrine is not available in retroactive support of collateral attack on past criminal convictions. (*In re Lopez*, 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], filed Jan. 29, 1965.) Petitioner's conviction of course occurred in 1955, nine years preceding *Escobedo*. Since his confession satisfies the admissibility standards laid down in these decisions, there is no reason to pivot our decision on the point of nonretroactivity.

Petitioner asserts that his confession was involuntary, being improperly induced by police promises to send him to a state hospital rather than prison and to free his son from the custody of the juvenile authorities. At petitioner's trial, his defense counsel made no claim of coercion or improper inducement and did not object to the playing of the tape-recorded confession. He did, however, engage in *voir dire* questioning of the police witnesses and argument to the jury in an effort to persuade the jury that defendant had falsely confessed in the hope of gaining the quick release of his son and hospital commitment for himself. In accordance with standard California procedure, the trial court instructed the jury that a confession is not voluntary if induced by police promises of immunity or benefit; that a confession must be disregarded unless the jury finds that it was voluntary.

We have examined the trial record in order to determine for ourselves whether the confession was voluntary; or whether, on the other hand, it was induced by police commitments, express or implied, of some immunity, lenience or benefit, either for defendant or his son. (*Haynes* v. *Washington*, 373 U.S. 503, 515 [83 S.Ct. 1336, 10 L.Ed.2d 513] ; *People* v. *Trout*, 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].) Our examination of the trial record convinces us that petitioner's present claims of involuntariness and improper inducement are without any basis in fact. The record convinces us that all attempts at bargaining were made by petitioner, not the police; that all petitioner's attempts were rejected by the officers.

---

tion in this case was heavily annotated and displayed unusual comprehension of the latest constitutional precedents. This capacity for litigation fortifies the view that his waiver of rights preceding his confession of March 10, 1955, was a highly intelligent one.

Petitioner, however, challenges our right to resolve his claim of involuntariness without a full evidentiary hearing, the trial record revealing a conflict of evidence on that score. He points out that the issue of voluntariness was submitted to the trial jury at the same time as the issue of his guilt.[2] He invokes *Rogers* v. *Richmond*, 365 U.S. 534 [81 S.Ct. 735, 5 L.Ed.2d 760], holding that a defendant's constitutional right to object to evidentiary use of a confession requires a decision on the issue of voluntariness without regard to the confession's truth or falsity. He invokes several corollary propositions laid down in *Jackson* v. *Denno*, 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908] : first, that due process is violated when the defendant raises the issue of voluntariness at his trial and conflicting evidence on that issue is submitted to the same jury which decides whether the confession is true or false and whether the defendant is guilty or innocent; second, that on habeas corpus review of a conviction so had, the reviewing court cannot dispose of the factual issue upon the undisputed portions of the trial record, but must hold a full evidentiary hearing.

These decisions do not entitle petitioner to a de novo hearing on the issue of voluntariness. At the time of petitioner's 1955 trial the defense had available, had request been made, a well-established California procedure for a preliminary determination of confession admissibility by the trial judge, preceding the jury's determination of the issue. Under that procedure, the trial judge hears evidence of the circumstances of the confession and makes a preliminary ruling on admissibility; rejects the confession if he finds it involuntary, and passes the ultimate issue of voluntariness to the jury only if his preliminary finding favors admissibility. That procedure had been evolved in California over a period of many years and was authoritatively stated in 1944 by *People* v. *Gonzales*, 24 Cal.2d 870 [151 P.2d 251], eleven years before petitioner's trial and 20 years before *Jackson* v. *Denno*. The California method does not transgress the standard pronounced in *Jackson* v. *Denno*. In fact, it corresponds rather precisely to the

[2]Petitioner pressed his claim of an improperly induced confession before the United States Court of Appeals, 9th Circuit, in 1960. That court held that in the face of conflicting evidence of coercion the resolution of that issue by the jury which tried Schlette was controlling. (*Schlette* v. *California, supra*, 284 F.2d 827.) The United States Supreme Court refused to review. (366 U.S. 940 [81 S.Ct. 1664, 6 L.Ed.2d 852].) Such decisions must now be measured by newer constitutional yardsticks furnished in such cases as *Jackson* v. *Denno* and *Townsend* v. *Sain, infra*.

"Massachusetts procedure" for determining the voluntariness of confessions, a procedure expressly approved in *Jackson* v. *Denno, supra,* 378 U.S. at pp. 378-379 [12 L.Ed.2d at pp. 916-917].

Both *Rogers* v. *Richmond* and *Jackson* v. *Denno* are implementations of the accused's constitutional right to object to an allegedly involuntary confession and to demand a finding on the issue of voluntariness uncluttered by questions of truth or falsity.[3] At his trial petitioner neither objected to the admission of his confession nor requested recourse to the California procedure which provided him the uncluttered determination of voluntariness which he now demands.

We are quite conscious of language in *Fay* v. *Noia,* 372 U.S. 391, at pages 426-428 [83 S.Ct. 822, 9 L.Ed.2d 837], indicating that the absence of objections in state criminal trials does not necessarily preclude habeas corpus inquiry into an allegedly involuntary confession. In *Fay* v. *Noia* the petitioner's failure to attack his conviction by appeal in the state courts was held not to preclude federal inquiry into state imprisonment based on a *concededly* coerced confession. Here, there is not only no concession, there is precious little evidence of involuntariness.

■ Subject to constitutional requirements, this court must decide for itself whether petitioner's claim of constitutional deprivation necessitates factual inquiry outside the trial court record. (See *In re Carmen,* 48 Cal.2d 851 [313 P.2d 817], cert. den. 355 U.S. 924 [78 S.Ct. 367, 2 L.Ed.2d 354]; *In re Bell,* 19 Cal.2d 488, 501.) ■ At this point we accept by inference the standards laid down for the federal courts in their habeas corpus review of state criminal convictions. These standards require a de novo hearing into confession voluntariness only under described circumstances, such as a conflict of fact, failure to provide a full and fair inquiry or the discovery of new and substantial evidence. (*Townsend* v. *Sain,* 372 U.S. 293, 312-314 [83 S.Ct. 745, 9 L.Ed.2d 770].)

How much and how little conflict requires a reopening of the record is an unresolved problem. There is hardly a crumb of conflict here. The trial testimony of the officers who interro-

---

[3]The majority opinion in *Jackson* v. *Denno* states (378 U.S. at pp. 376-377 [12 L.Ed.2d at pp. 915-916]): "Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession. *Rogers* v. *Richmond, supra.*"

gated Schlette is unqualified in its composite denial of any bargains or inducements. This denial is supported by the telephone conversation between petitioner and his mother preceding the confession. Her promise to care for his son, rather than any promise by the police, supplied the apparent and immediate motivation for his decision to confess. His elaborate attempt to attach retroactive conditions to his confession supplies an inference that there were no preexisting conditions. In summation to the jury, petitioner's trial counsel did not attempt to persuade the jury that police promises were made, but only that petitioner had falsely confessed in the hope of immunity or lenience for himself and release of his son. The opposite side of the scale contains a palpable but tiny weight—Schlette's own uncorroborated testimony that he had exchanged his confession for police promises.

Decisions demanding a new evidentiary hearing on habeas corpus feature evidence corroborating the defendant's claim of coercion or improper inducement. In *Jackson* v. *Denno,* for example, the defendant was wounded and depressant drugs had been administered before his confession. In *Townsend* v. *Sain* the suspect was a narcotics addict of low mentality, suffering from withdrawal symptoms and under the influence of depressant drugs. Here, in contrast, the conflict in evidence is created only by defendant's unsupported assertion of inducement. These assertions are belied by the other witnesses and by the circumstances surrounding the confession.

We hold that the conflict is so insubstantial that de novo inquiry into the issue of voluntariness is not justified. Petitioner does not claim that the trial procedures foreclosed any inquiry into the circumstances of his confession. He proposes no new evidence. An evidentiary hearing at this point would produce nothing new except a chance to observe witnesses whose testimony is already recorded. Petitioner would have us sift through a well-trodden evidentiary haystack in search of a phantom constitutional needle. His showing does not measure up to the criteria for a de novo hearing into the circumstances of his confession.

The order to show cause is discharged and the petition for habeas corpus denied.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied March 10, 1965.