[Crim. No. 9192. Second Dist., Div. Two. Aug. 24, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM CULLY, Defendant and Appellant.

William Cully, in pro. per., and David E. Agnew and Richard C. Cummings, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Marvin Goldsmith, Deputy Attorney General, for Plaintiff and Respondent.

FLEMING, J.—On rehearing, pursuant to order of the Supreme Court for further consideration in the light of *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *Massiah* v. *United States*, 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246].

The police, in searching for an unidentified burglary suspect whom they believed to have been wounded the previous night while fleeing the scene of the crime, the Beau Jest Bar, came upon Cully the next afternoon in a private house near the area of the shooting in what appeared to be a wounded condition. Officer Najera, who had not witnessed the attempted burglary and shooting at the Beau Jest Bar and who was investigating the case on information furnished by other members of the police department, arrested and handcuffed Cully and called for an ambulance. Prior to the arrival of the ambulance the conversation between the parties consisted of the officer's question, ''Are you hurt?'', and the suspect's answer, ''I have a sore throat.''

After the suspect had been placed in the ambulance about 1 p.m. Officer Najera rode with him to the hospital, and during the ride Cully made a complete confession of the attempted burglary. He said he was not a good burglar and had got caught, that he was a better robber than burglar. He had been in back of the bar of the cafe and been surprised by the police, one of whom had shot at him. He had thrown his screwdriver at another, and started to run, and been hit while running across the street or jumping the fence. This was the first time he had burglarized any place, and he had gotten the idea from his roommates, Bruce, Steve, and Mike, who had burglarized numerous bars in Highland Park.

As a consequence of this information, Cully's roommates were investigated and arrested for other burglaries.

Cully was tried by a court without a jury and convicted of attempted burglary with a record of two prior robbery felonies. In addition to his confession, the evidence against him included his direct identification by Officer Holubiczko

as the burglar who had been surprised at the Beau Jest Bar and shot while making good his escape.

The principal question is whether the use as evidence of the confession by Cully in the ambulance on his way to the hospital was a violation of his right to the assistance of counsel and to remain silent guaranteed by the Sixth and Fifth Amendments to the Constitution. (*Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] ; *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246] ; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) No claim of coercion is involved. The issue turns on whether at the time of the confession the accusatory stage had been reached so that the right to benefit of counsel attached. A subsidiary question is whether the use in evidence of a second confession duplicating the first, which Cully gave the police at 7:30 that evening in the hospital, requires a reversal of the judgment. Other contentions of Cully, lack of probable cause for his arrest, use of evidence obtained by illegal search and seizure, insufficiency of the evidence to support a conviction for attempted burglary, are without merit and have been fully covered in the prior unpublished opinion in this case by Mr. Justice Fox, whose statements on these points we adopt.

Under the guarantee of the right to counsel articulated in *Escobedo* and *Dorado,* whenever a criminal inquiry has ceased to be investigatory and become accusatory, the suspect has become for all practical purposes one accused of

crime, he must be advised of his right to counsel and his right to remain silent. (Sixth and Fifth Amendments to the United States Constitution.) ▇ Absent proof of such advice, statements obtained from him in the accusatory stage may not be received in evidence over his objection. (*People* v. *Stewart,* 62 Cal.2d 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97].) ▇ The accusatory stage is reached when two conditions have been met: (1) the suspect has been placed under arrest, and (2) the police have undertaken a process of interrogations whose objective purpose is to elicit a confession of guilt. (*People* v. *Stewart,* p. 577.) ▇ The question at bench is whether the accusatory stage had been reached at the time Cully was placed in the ambulance; for if it had, the admission in evidence of a confession obtained as a result of questioning would have been reversible error; but if it had not, his confession could have been received in evidence against him, for as *Escobedo* has said, only when an investigation has shifted to the accosatory stage, and the suspect has become an accused, and the questioning has become designed to elicit a confession, does the adversary system begin to operate. (378 U.S. 478, 492.)

▇ In our view the inquiry at the time of the conversation in the ambulance between Cully and Officer Najera was still investigatory and had not reached the accusatory or critical stage, and therefore the confession was properly obtained. Officer Najera in making his arrest was proceeding on inference derived from circumstantial evidence, which, although strong enough to justify an arrest, by no means foreclosed the possibility that Cully was not the man involved in the Beau Jest burglary. It was quite possible that the suspect's difficulties had arisen from unrelated activities. Cully might have been up to other mischief which he did not wish known to the police, or he might have been engaged in some private venture which a point of honor forbade him to disclose. If such had been the case, his initial reluctance to

disclose other activities, even of a discreditable nature, might have been quickly dispelled by his need to solve his current difficulty. Officer Najera had never seen the suspect before, he had not been at the scene of the crime, and at that point had heard neither admissions nor denials from the suspect in relation to the Beau Jest Bar caper. Conversation between the two at that stage served two purposes: it provided the suspect with an opportunity to clear himself of matters with which he was not involved, and it gave the police an opportunity to hear the suspect's explanation of his predicament.

This case falls squarely within the *Konigsberg* rule adopted in California in *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]. The Supreme Court in *Stewart* rejected the argument that the accusatory stage necessarily begins at the time of arrest, stating that although in most cases the process of interrogations following an arrest is accusatory, it is not necessarily so. The court cited with approval *United States* v. *Konigsberg,* 336 F.2d 844, cert. den., 379 U.S. 933, and commented as follows (pp. 578-579): ''In the *Konigsberg* case, *supra,* Federal Bureau of Investigation agents apprehended the defendants in a garage containing stolen goods, arrested them and took them to the bureau's office. At that office, prior to an arraignment, the agents asked Konigsberg, ' ''why he was in this garage and just what had taken place . . . and . . . if he wished to cleanse himself or explain . . . what his reasons for being there were, why the other individuals were there.'' ' (*Id.* at p. 852.) Konigsberg then made some incriminating statements. Among other reasons for not applying *Escobedo,* the court said that the purpose of the investigation, even though it took place after the arrest, was not to elicit a confession. The court stated, 'The uncontradicted purpose of the discussion was to give Konigsberg a chance to explain his presence in the garage if he could; to hear Konigsberg's side of the story. . . . If Konigsberg or any of the other people caught in the garage could account for their presence this was their opportunity.' ''

In adopting the *Konigsberg* rule that a suspect may be asked for his explanation a reasonable time after his arrest, we believe the Supreme Court sought to maintain free communication between suspect and officer for reasons beneficial to both suspect and society—beneficial to the suspect by encouraging early communication which could lead to his speedy release, and beneficial to society by continuing to use

to advantage the tendency of guilty persons to confess all on first being caught. These considerations have been well described by Professor Wigmore: ''(1) In the first place, an innocent person is always helped by an early opportunity to tell his whole story; hundreds of suspected persons every day are set free because their story thus told bears the marks of truth. Moreover, and more important, every guilty person is almost always ready and desirous to confess, as soon as he is detected and arrested. . . . The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature. It is natural, and should be lawful, to take his confession at that moment—the best one. . . . '' (Wigmore on Evidence (3d ed.) § 851, p. 319, quoted by Traynor, J., concurring in *People* v. *Garner*, 57 Cal.2d 135, 163 [18 Cal.Rptr. 40, 367 P.2d 680].)

The problem of the courts is to keep in balance the social interest in the general security and the social interest in individual free will, to preserve the protection to society derived from the tendency of guilty persons to confess on first being caught and at the same time protect the individual from abusive questioning and the threat of compulsion. The usefulness of properly-secured confessions has long been recognized and approved. (*People* v. *Garner*, 57 Cal.2d 135, 164 [18 Cal.Rptr. 40, 367 P.2d 680]; *Culombe* v. *Connecticut*, 367 U.S. 568, 571 [81 S.Ct. 1860, 6 L.Ed.2d 1037].) No court has suggested that the use of confessions be outlawed; rather the recent rules are designed to assure that confessions received in evidence are reliable and voluntary and have been secured in conformity with due process.

The main thrust of recent restrictions on the questioning of individuals under arrest clearly appears from the language of *In re Lopez*, 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], which tells us that the *Escobedo* and *Dorado* rules are aimed at the use of oppressive police practices to dissolve and overbear the will of the individual. Again and again the *Lopez* opinion articulates the objective of the restrictions:

''to eliminate conditions which invited coerced confessions'' (p. 372);

''to prevent police tactics which, in the past, have spawned involuntary confessions'' (p. 372-373);

"prevention of coercive practices" (p. 373);

"compulsory self-disclosure as a source of proof" (p. 373);

"a readiness to resort to bullying and to physical force and torture" (p. 373);

"confessions have often been extorted" (p. 373);

"the prevention of practices that might lead to coerced confessions" (p. 373);

"the possibility of extorted confessions" (p. 373);

"effective antidote to abusive police tactics and extorted confessions" (p. 373);

"the third degree" (p. 374);

"coerced confession" (p. 374);

"to sterilize the police antechamber from the use of coercive tactics" (p. 374);

"inadequacy of present methods of dealing with involuntary confessions" (p. 374);

"coercion that might occur during police interrogation" (pp. 374-375);

"the correction of the conditions which invited the coerced confessions and the attendant evils" (p. 375);

"the evil fruit of the coerced confession" (p. 375);

"secret interrogation was the source of coercion" (p. 377);

"to discourage oppressive practices" (p. 377);

"by drying up the sources of coercion" (p. 382).

Clearly, coercion is the enemy with which we wrestle, not the use of free confessions. Where the possibility of coercion is minimal, questioning of a suspect under investigation serves the public interest. A suspect, even one under arrest, may be questioned at a time when the inquiry is still investigatory and has not reached the accusatory stage. (*People* v. *Stewart,* 62 Cal.2d 571, 578-579 [43 Cal.Rptr. 201, 400 P.2d 97].) Only after an investigation has reached the accusatory stage does the possibility of pressure on the accused become a significant factor so as to require the protection of counsel and advice as to his rights.

To determine whether questioning of a suspect under arrest has been properly investigatory or improperly accusatory, the Supreme Court in *Stewart* suggested the use of a five-point test to evaluate the circumstances of the questioning. Factors specified are: (1) time of interrogation; (2) place of interrogation; (3) length of interrogation; (4) nature of the questions; (5) conduct of the police. These and other relevant circumstances make up "the total situation which envelops the questioning", from whose examination

the court will determine whether or not the inquiry had reached the accusatory phase during the course of which the police carried out a process of interrogations which lent itself to eliciting incriminating statements. (*Escobedo* v. *Illinois*, 378 U.S. 478, 491 [74 S.Ct. 1758, 12 L.Ed.2d 977].) ▇▇ In the present case the evidence shows these factors answerable somewhat as follows:

Time of interrogation—about 1 p.m. immediately following arrest;

Place of interrogation—in the ambulance on the way to the hospital;

Length of interrogation—while riding to the county hospital;

Nature of questions—whether the suspect was the man involved in the Beau Jest attempted burglary; the conversation was in large part a narrative statement by the suspect;

Conduct of police—there is no evidence of threats, promises, over-reaching, accusation, or cross-examination.

Clearly, here, the suspect was being offered an opportunity to explain if he were a victim of mistaken identity. What resulted was not only the suspect's confession but the furnishing of valuable information to the police about other crimes which led to other arrests for other burglaries.

Appellant argues that any conversation with a suspect after an arrest on probable cause is improper. Yet this is not what our Supreme Court said in *Stewart*. It specifically rejected such a mechanical rule and formulated the pragmatic test previously referred to. (Pp. 578-579.) The inquiries in the ambulance appear to us to have been part of a normal investigatory process which a conscientious officer would be duty-bound to make in order to assure himself he had arrested the right man and not been led astray by suspicious circumstances. In the course of performing this duty Officer Najera not only solved the Beau Jest Bar burglary but secured information which led directly to the solution of other burglaries and the arrest of other burglary suspects. Were we to hold this questioning to have been in violation of the Constitution, logically, we might be required at some future time to suppress all evidence of the crimes of Bruce, Steve, and Mike, which had been uncovered by means of Cully's disclosures in the ambulance, as tainted fruit from a poisoned tree. (*People* v. *Reeves*, 61 Cal.2d 268 [38 Cal.Rptr. 1, 391 P.2d 393]; *People* v. *Ditson*, 57 Cal.2d 415, 439-440 [20 Cal.

Rptr. 165, 369 P.2d 714]; *Wong Sun* v. *United States,* 371 U.S. 471, 487-488 [83 S.Ct. 407, 9 L.Ed.2d 441].)

In our view the confession of the suspect in the ambulance on the way to the hospital was properly obtained, properly introduced in evidence, and properly used to make other arrests of other suspects for other crimes. (*People* v. *Ford,* 234 Cal.App.2d 480, 486-494 [44 Cal.Rptr. 556]; *People* v. *Beverly,* 233 Cal.App.2d 702, 715-716 [43 Cal.Rptr. 743]; *People* v. *Fork,* 233 Cal.App.2d 725, 735-737 [43 Cal.Rptr. 804].)

The remaining point in this case involves the admission in evidence of a second confession given by Cully to Officer Combs in the hospital about 7:30 p.m. on the evening of his arrest. Officer Combs asked what had happened that morning. Cully told him he had been at the Beau Jest Bar trying to get in the back way when the cops drove by with their lights off. He took off and a cop started after him, but he didn't stop because he didn't want to go back to the joint. When a cop almost got him he threw his screwdriver and took off again. Bruce and Steve and Mike had been hitting all the bars in Highland Park, and Bruce was the one who had gone through the roof at the 58 Club on Figueroa.

The apparent purpose of this further interview was to secure a written statement—which Cully declined to give—and obtain more information about the activities of Cully's roommates. At that point the police already had the benefit of Cully's first confession, the accusatory stage had been reached, and therefore Cully, the accused, should have been advised of his right to counsel and his right to remain silent. Absent such advice, the use in evidence of his second confession was improper. However, the second confession given to Officer Combs at the hospital almost repeated word for word the first confession to Officer Najera in the ambulance, and added nothing to the case except reiteration. (*People* v. *Robinson,* 62 Cal.2d 889, 897 [44 Cal.Rptr. 762, 402 P.2d 834].) Since the first confession was properly admitted in evidence, we see no prejudice to the defendant from the improper admission of a second confession covering the same ground, especially since the case was tried by the court without a jury. (*People* v. *Ford,* 234 Cal.App.2d 480, 494-495 [44 Cal.Rptr. 556].) In our opinion the impropriety of this admission did not result in a miscarriage of justice, and a different result on retrial is not probable. (*People* v. *Atchley,* 53 Cal.2d 160, 170-171 [346 P.2d 764]; *People* v. *Moya,* 53

Cal.2d 819, 822 [3 Cal.Rptr. 360, 350 P.2d 112]; *People* v. *Garner,* 57 Cal.2d 135, 144 [18 Cal.Rptr. 40, 367 P.2d 680]; *United States* v. *Bayer,* 331 U.S. 532, 540 [67 S.Ct. 1394, 91 L.Ed. 1654].) The constitutional provision with respect to harmless error applies. (Cal. Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818, 834-837 [299 P.2d 243]; *People* v. *Modesto,* 62 Cal.2d 436, 462-464 [42 Cal.Rptr. 417, 398 P.2d 753], Peters, J., concurring and dissenting.)

Appellant's purported appeal from the order denying his motion for a new trial is dismissed. (Pen. Code, § 1237, subd. 1.)

The judgment of conviction is affirmed.

Herndon, J., concurred.

ROTH, P. J.—I dissent.

Appellant was convicted of the crime of attempted burglary in the second degree in violation of sections 459 and 664, Penal Code, in that on January 13, 1963, he attempted to enter the building occupied by the Beau Jest Bar, with intent to commit theft therein. He admitted two prior felony convictions of robbery.

There were two doors through which the beer tavern could be entered from the rear. One was nailed shut while the other was operating. During the early morning of January 13, 1963, two Los Angeles police officers were patrolling the Highland Park area of Los Angeles in the vicinity of the tavern. At about 5 o'clock in the morning, while it was still dark, the officers passed through an alley approximately 50 feet from the rear of the tavern. The lights of their police car were off. One of the officers observed someone at the rear door. The person turned and ran through a parking lot. The officers gave chase on foot. The officers yelled, "Police" and commanded him to stop. A number of shots were fired. After an extended chase, one of the officers observed the person duck in back of a bush. The officer approached the other side of the bush, reached over it and found himself directly opposite the other person. The officer pointed his gun at this person and told him to stop right there. He had the person in view at that time and later identified him as appellant.

As the officer started to go around the bush, appellant began walking toward the officer who noticed that appellant was holding an object in his right hand. The officer pointed his gun at appellant and ordered him to drop the object.

Appellant continued to edge closer to the officer who maintained a distance of about 15 feet between himself and appellant. The officer again ordered appellant to drop the object but, instead, appellant made a throwing motion at the officer, who then fired at appellant and hit appellant in a nonvital spot. The object which appellant threw at the officer was a screwdriver. Appellant escaped by running into the driveway of a private residence, and the officer lost sight of him among the various houses.

Officer Najera, together with Officer Siler and Sergeant Chinis of the Los Angeles Police Department were sent to the area later in the morning to investigate the above detailed events. None of said officers took part in the chase heretofore detailed. Officer Najera observed fresh blood stains on the ground near a bush in that area. He followed the spots of blood over fences and through back yards for some distance. He talked to a lady in an apartment house located in the neighborhood. This lady told Najera that she had seen a stout lady buying a big bunch of bandages, more than one would ordinarily use in a year's time. Najera then went to the store where the lady said the bandages had been purchased. He was told that the lady who bought the bandages lived in the vicinity. Najera then started going from house to house looking for a lady who answered the above description. He observed a lady coming up the street from the drugstore with another package of bandages. He stopped her and explained to her that he was looking for a man who had been shot. This lady took the officer to her home, telling him that the man was there. She said that he had come in early that morning and that she had been putting bandages on his wound. She led the officer to her home and let him in. He found appellant lying on a mattress in the rear bedroom of the house.

Officer Najera described appellant's condition as follows: "The defendant had his neck bandaged and his leg, his upper leg almost to his buttocks, that was bandaged, and blood was coming out of the bandages. . . . [Referring to the leg bandages] . . . It was almost in the middle of his buttocks, the bandage was clear around the trunk of his body."

Officer Najera asked appellant "Are you hurt?" Appellant replied "I have a sore throat." Najera further testified "When he told me he had a sore throat he had a large bandage on his neck, and it was all bloody and he was bleeding from that area—it would be the left side of his neck."

Najera further testified as follows:

"Q. As soon as you saw him then you told him he was under arrest? A. Either Officer Siler or Sergeant Chinis or myself told him he was under arrest. I believe they used the handcuffs on him immediately."

On cross-examination, Officer Najera stated that he and Officer Siler and Sergeant Chinis, who were with him in the home in which appellant was found, picked up and recovered all articles of appellant's clothing that could be found in the bedroom or on the premises.

He also testified as follows:

"Q. At the time of your recovery of the clothing, in your mind did you feel that this was the man that had committed the burglary that you had been notified about? A. Yes."

Najera further testified he called an ambulance. He then testified ". . . I . . . stood by until the ambulance crew put him in the ambulance. I rode with him in the ambulance. During the course of the trip to the hospital we had other conversations. Q. Were the statements made by the defendant freely and voluntarily given to you? A. Yes, they were. Q. Did you make some threats or any promises of reward or immunity . . . ? A. No, I did not. Q. Did you use any force on him for his statements? A. No, I did not."

Najera related the conversation as follows: "Most of this conversation is probably—not exactly the way he told it to me, but in essence it was that he was not a good burglar . . . that he was a better robber than a burglar. He got caught. That the only reason he went to burglarize this bar . . . was because—and he named the people, . . . they were people we arrested right after we arrested him. He said they had been burglarizing numerous bars in Highland Park so he got the idea to do the same thing; but he wasn't too good at it and he got caught.

"   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Did he make any statement to the effect as to whether or not he was burglarizing the premises when the police arrived, that you recall? A. Yes, he said that was the first time he had burglarized that place or any place; that he had got the idea to burglarize it from his roommates, and he named these people, . . ."

Later that day Officer Combs of the Police Department interviewed appellant at the hospital. He testified that at that time he asked appellant to tell him what happened the previous night at the Beau Jest Bar, and that he would write

down what he was told. ''He [appellant] said, 'Yeah, I'll tell you what happened. This morning I was behind the Beau Jest Bar and trying to get in the back way. I saw the cops driving by with their lights off. I took off and then one cop started after me. . . .

''When he did almost get me I threw this screwdriver I had at him and took off again. Sure, he told me to stop, but like I said I didn't want to go back to jail.

''This is the first time I hit that place. . . .''

In seeking a reversal, appellant contends that: there was no probable cause for his arrest; that there was an illegal search and seizure; that the corpus delicti of burglary was not established; that the evidence was insufficient to support the judgment, and that his confession was inadmissible. I agree with the majority that the evidence as outlined disposes of the first four of these contentions. I disagree that the ambulance conversation on the facts of this record occurred during the investigatory stage.

When appellant told Officer Najera that he had ''a sore throat'' he was handcuffed and placed under arrest. Suspicion for the commission of the crime had admittedly focused directly on appellant. Officer Najera not only stated that he thought appellant was the man who committed the crime, admittedly a subjective test, but all the facts and circumstances surrounding the handcuffing and arrest of appellant were ample evidence of probable cause to justify the arrest and to justify Officer Najera's statement that he thought he had his man. In *People* v. *Stewart*, 62 Cal.2d 571, 577-578 [43 Cal.Rptr. 201, 400 P.2d 97], the court said: ''An arrest fulfills the first requirement that the investigation has begun to focus on a particular suspect. The Penal Code itself conditions the arrest upon the presence of reasonable ground for the belief that the individual committed the offense; section 813 predicates the issuance of a warrant upon 'reasonable ground to believe that the defendant has committed' the offense; section 836 requires that the arrest must rest upon the officer's reasonable cause for believing the person committed the offense.

'' 'Probable cause for an arrest,' we have said, 'is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. . . . Probable cause may exist even though there may be some room for doubt. . . . The test in such case is not whether the evidence upon which the officer

made the arrest is sufficient to convict but only whether the prisoner should stand trial.' (*People* v. *Fischer* (1957) 49 Cal.2d 442, 446 [317 P.2d 967]; see generally, Witkin, Cal. Criminal Procedure (1963) pp. 102-104; Fricke, Cal. Criminal Procedure (6th ed. 1962) pp. 19-20.)''

Nothing in the record indicates whether or not appellant was informed prior to any conversations with any of the officers of his rights to counsel and to remain silent, or whether he otherwise knowingly and intelligently waived those rights. And specifically there is nothing in the record to show he was advised of or effectively waived such rights prior to his statements to Officer Najera in the ambulance.

The statements in the ambulance amounted to a complete confession of the crime.

As stated in *Stewart, supra,* p. 579 ''. . . Whatever may be the subjective intent of the interrogators, we must, in order to determine if the police are carrying out 'a process of interrogations that lends itself to eliciting incriminating statements' . . . analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.''

As some writers have suggested, ''An objective test is . . . likely for the new American rule, for it is noteworthy that the question of 'purpose to elicit a confession' may be more readily determined from the objective evidence—such as the nature of the questions and accusations put to defendant and the length of the interrogation—than the question whether the police had decided to charge the defendant.'' (Enker and Elsen, *Counsel for the Suspects: Massiah* v. *United States and Escobedo* v. *Illinois* (1964) 49 Minn. L.Rev. 47, 71.)

The record in the instant case of the conversations, particularly that in the ambulance, does not indicate a question and answer approach. In fact Officer Najera testified: ''Most of this conversation was from Mr. Cully to me. I did very little questioning. . . .''

I feel that the record shows that ''The weight of the circumstantial evidence recited . . . and available to [Najera] . . . at the point of interrogation provided reasonable grounds for focusing upon defendant as the particular suspect.'' (*People* v. *Dorado, supra,* p. 347.)

The negative pregnant in the officer's testimony suggests

that although little, he did engage in some questioning and that few or little as the questions might have been, they were designed to elicit answers which would incriminate.

It is clear to me that when appellant was placed in the ambulance, the accusatory stage had been reached. He confessed in the ambulance to Officer Najera in response to ". . . very little questioning"; the "very little questioning" succeeded in obtaining incriminating statements amounting to a confession. Appellant was not advised of his right to counsel or of his right to remain silent and there is nothing to indicate that he effectively waived either. We can make no presumption that such rights were waived (*People* v. *Stewart, supra,* p. 580). In these circumstances the statements of appellant made in the ambulance and certainly those in the hospital later in the day which were taken down, were illegally admitted into evidence. Such error requires reversal. (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Modesto,* 62 Cal.2d 436, 447 [42 Cal.Rptr. 417, 398 P.2d 753]; *In re Schlette,* 232 Cal.App.2d 407 [42 Cal.Rptr. 708]; *People* v. *Ahmed,* 232 Cal.App.2d 314 [42 Cal.Rptr. 854].)

I would reverse the judgment.

Appellant's petition for a hearing by the Supreme Court was denied October 20, 1965. Peters, J., was of the opinion that the petition should be granted.